348 So.2d 443 (1977)
ALABAMA PUBLIC SERVICE COMMISSION et al.
v.
SOUTH CENTRAL BELL TELEPHONE CO., a corporation.
SC 1682.
Supreme Court of Alabama.
June 3, 1977.
Rehearing Denied August 12, 1977.
*444 Maurice F. Bishop, Birmingham, for Hon. George C. Wallace, Governor of Alabama.
Truman Hobbs and Carl L. Evans, Montgomery, for Ala. Public Service Commission.
Robert E. Steiner, III, Montgomery, W. M. Booker, Atley A. Kitchings, Peyton D. Bibb, J. Richard Teel, Birmingham, for appellee.
*445 BEATTY, Justice.
On February 15, 1975, South Central Bell Telephone Company (the Company) filed a request with the Alabama Public Service Commission proposing a new intrastate rate and charge schedule. The new schedule, if approved, would allow $59,109,900 in additional revenue annually.
The Company provides local exchange telephone service and both intrastate and interstate toll service for five southeastern statesAlabama, Kentucky, Louisiana, Mississippi and Tennessee. The Company is a wholly owned subsidiary of American Telephone and Telegraph (AT&T) and began operation on July 1, 1968 when a five-state network split off from Southern Bell Telephone and Telegraph Company. As of December 31, 1974, the Company operated 91 exchanges which serve over 949,000 customers. AT&T, the parent company of the Bell System, has 21 principal telephone subsidiaries across the country as well as a number of other subsidiaries such as Western Electric Company, Inc. and Bell Telephone Laboratories, Inc. All of the Company's common stock is owned by AT&T and its debt-equity ratio is about 45% debt and 55% equity.
The Alabama Public Service Commission (the Commission) suspended the proposed schedule of rates on March 3, 1975 for a period of six months, through September 8, 1975, pursuant to Title 48, § 54, Alabama Code (Recomp.1958), as amended. Hearings were held between May 26, 1975 and August 5, 1975 on the proposed new schedule of rates and the Honorable George Wallace, as Governor, the State of Alabama, and the Secretary of Defense and the Executive Offices of the U.S. Government were permitted to intervene as parties.
On September 5, 1975, the Commission issued its order granting an increase in the schedule of rates and charges which would allow $16,694,545 in additional revenue annually. The Company, the State and the Governor appealed from the Commission order to the Circuit Court of Montgomery County under Title 48, § 79, Alabama Code. The Company then filed a request to supersede the order of the Commission under Title 48, § 84, Alabama Code, but the circuit court denied this request in an amended order entered November 7, 1975.
The case was argued on its merits December 18, 1975 and the circuit court entered its final decree on January 6, 1976. This decree fixed an overall rate of return at not less than 9%, which amounted to a 39½ million dollar annual rate increase, granted the Company's request for supersedeas of the entire 59 million dollar rate increase originally proposed upon execution and filing of bond, and remanded the case to the Commission to establish a schedule of rates in accord with the 9% return. On February 3, 1976, the Governor, the State and the Commission filed notice of appeal to this Court.
The sole issue presented here is whether the Commission's order granting a $16,694,545 annual rate increase and hence a 7.56% overall rate of return amounts to confiscation vel non of the Company's property.
Where a rate case is appealed from the circuit court this Court's scope of review is based on firmly established legal principles. When confiscation is alleged the Court must exercise broad review to determine upon its own independent judgment on both the law and the facts whether the rates fixed by the Commission fall within constitutional limits. As stated by the United States Supreme Court in Board of Public Utility Com'rs v. New York Telephone Co., 271 U.S. 23, 46 S.Ct. 363, 70 L.Ed. 808 (1926):
The just compensation safeguarded to the utility by the Fourteenth Amendment [to the United States Constitution] is a reasonable return on the value of the property used at the time that it is being used for the public service, and rates not sufficient to yield that return are confiscatory.. . . .
Several legal principles control the determination of a fair rate of return in order to avoid confiscation. In Alabama Public Serv. Com'n v. Southern Bell T. & T. Co., 253 Ala. 1, 42 So.2d 655 (1949) these were outlined:

*446 I. The reasonable rate of return depends upon many circumstances. It cannot be developed by a rule of thumb calculation. It must be determined in the exercise of a fair, enlightened and independent judgment in light of all relevant facts. . . .
II. The rate of return must be equal to that generally being earned by others in the same general locality in business undertakings attended by corresponding risks and uncertainties. . . .
III. The return must be sufficient to assure the investor's confidence in the financial soundness of the utility enterprise and enough to maintain and support its credit so that it will be able to raise the money necessary to improve and expand its service to the discharge of its public duties. . . .
IV. In determining the reasonableness of rates it is necessary to consider the effect of the rates imposed in the light of the utility's present situation and in light of its requirements and opportunities.. . .
When considering confiscation, ". . . we should remember the principle that the property of a public utility, although devoted to the public service and impressed with a public interest, is still private property.. . ." Alabama Public Serv. Com'n v. Southern Bell T. & T. Co., supra.
The fixing of a fair rate of return is exclusively within the jurisdiction of the legislature or its agency, the Public Service Commission. State v. Southern Bell Telephone and Telegraph Company, 274 Ala. 288, 148 So.2d 229 (1962). In that connection, we observed in Alabama Public Serv. Com'n v. Southern Bell T. & T. Co., 268 Ala. 312, 106 So.2d 163 (1958) that:
. . .An appropriate rate of return necessarily will vary, depending upon the particular conditions and factors in each case. . . . However, we would emphasize that the responsibility for fixing rates and charges which are reasonable and just to both the utilities and the public rests with the Commission and not with the courts. So long as the Commission pursues its statutory authority, within constitutional limits, the courts should not interfere with its determinations.
We also recognize that the decree of a circuit court, based upon the record of the Public Service Commission in a rate case, reaches us with no presumption of correctness.
After taking lengthy testimony and then applying the rate base method, the Commission determined that the overall rate of return should be 7.56%. This application conforms to Alabama law:
As we interpret the above statutes, [Title 48, §§ 52, 319, Alabama Code] their effect is to have our Public Service Commission determine utility rates under the theory of a fair rate of return based upon a fair and adequate rate base, as distinguished from the so-called "cost of capital" theory, for determining the rate of return.
Under the rate base theory of determining a fair rate of return, the rate base is the valuation placed on the utility property. State v. Southern Bell Telephone & Telegraph Company, supra.

Title 48, § 52, Alabama Code, as amended, establishes the method for fixing the rate base:
. . . For the purpose of fixing rates such reasonable value of a public utility's property shall be deemed to be the original cost thereof, less the accrued depreciation, as of the most recent date available, and the amount of the new investment to be added in the year immediately following the test period used in arriving at the value of such utility's property.. . .
The Company in the instant case has chosen 1974 as its test year, and the Company and the Commission have agreed upon a rate base of $775,662,119. Neither party disputes the correctness of this amount, and both concede that it complies with Title 48, *447 § 52, Alabama Code, as amended. The deduction for the depreciation reserve reflects generally accepted accounting procedures for determining the present book value of assets. The calculations used to establish the rate base, however, may be helpful in appreciating our other conclusions:

The statutory rate base
(investment as of 12-31-74)
Telephone Plant in Service $774,903,031
Telephone Plant Under Construction 25,705,565
Property Held for Future Telephone
Use 677,367
Material and Supplies 4,478,471
Cash Requirements 531,281
 _____________
Total Investment $806,295,715
Less Depreciation Reserve (140,728,668)
 _____________
Net Investment $665,567,047
New Investment to be added
12 months ending 12-31-75
(undepreciated) $110,455,972
Less Unrefunded Portion of Customer
Funds (360,000)
 _____________
Total $775,662,119

The Commission then determined that a 7.56% overall rate of return would be fair and reasonable to the Company. When the 7.56% rate of return is applied to the statutory rate base it gives $58,640,056 in net operating income:

7.56% × $775,662,119 = $58,640,056

After the Company's $54,888,566 actual net operating income for 1974 was adjusted by the Commission, to account mainly for the required wage rate increase, a net income deficiency of $8,194,581 (after taxes) is noted. In calculating the adjusted net operating income, the Commission allowed a whole year's deduction for the Communication Workers of America wage increase which became effective only in August, 1975. This wage increase has the effect of reducing net operating income by $4,119,250, and the lower the adjusted net income figure, the greater the amount of the rate increase that must be allowed to give a $58,640,056 overall return. Accordingly, by allowing the wage increase for the entire year, the calculation of net operating income clearly is in favor of the Company.
The income tax factor (the Company's marginal income tax rate) must be multiplied by the gross operating income (before taxes) to achieve net operating income (after taxes). When this tax factor is considered, gross operating income requires $16,694,545 in additional revenue to achieve the desired $58,640,056 overall return. This $16,694,545 is the amount of the rate increase allowed by the Commission order:

Operating Income Calculations
Net Income Determined to
give fair rate of return
(after rate increase) $ 58,640,056
Adjusted Net Income (including
allowance for CWA Wage Increase) 50,445,475
 ____________
Net Income Deficiency (after tax) $ 8,194,581
Applying the Income Tax Factor (0.4908538)
0.4908538 × $16,694,545 = $8,194,581
Gross Income Deficiency
(before tax) $ 16,694,545

The Commission also found the cost of debt to be 7.49% and that the appropriate debt-equity ratio is 45-55%. There is no issue between the parties on these. The cost of debt is the composite cost to the Company for acquiring investment funds generally from lending institutions and through issuance of bonds. This cost of debt percentage can be used to determine interest expense.
Among the financial data which we may use in ascertaining a fair overall rate of return is an analysis of the debt-equity ratio. The debt-equity ratio is important because it affects both the cost of debt and the cost (rate of return) of equity capital. When the amount of debt is moderate the debt and equity investment are less risky to the investor. However, if the amount of debt is relatively high the debt and equity investment becomes more risky, hence their costs or required rate of return becomes higher. These higher costs in turn necessitate a higher overall rate of return so that the appropriate funds may be generated. By the same token, if the amount of debt is moderate the overall rate of return required will be less. In State v. Southern Bell Telephone and Telegraph Company, 274 Ala. 288, 148 So.2d 229 (1962), this Court said:
The ideal capital structure would allow a debt-equity ratio in amounts that the company would get its full benefit in the amount of debt capital, and yet not have *448 the debt component so high as to discourage prudent investors. This ideal capital structure is not static. However, many commissions and courts for rate making purposes, have concluded that a debt-equity ratio of 45% debt-55% equity most nearly approximate a proper debt-equity ratio.
Additionally, the record shows that telephone utility investment is less risky than many other types of utilities.
We consider next the rate of return on the Company's equity investment. The equity funds (net income after the rate increase minus the interest expense on the debt capital) are divided by the equity investment to give the rate of return on equity investment. Equity funds can be used to pay dividends and for retained earnings. This rate of return is an essential consideration under the "cost of capital" theory but it is not to be given strict mathematical significance under the rate base theory.
As we have noted, if the debt portion of capitalization is not too high the Company's investment will be less risky and a moderate rate of return on equity will be required. Here, we find a 45-55% debt-equity structure which the record shows is considered the reasonable maximum amount of debt for business purposes.
"The ultimate question of a fair rate of return should not be a composite of the results mechanically reached by these formulae, with little regard given to the question sought to be determined, that is, the fair rate of return." State v. Southern Bell Telephone and Telegraph Company, supra.
In its briefs, the Company's calculations establish an 8.66% rate of return on equity, using what appears to be a composite method, whereas the Commission finds a 12.24% rate, using invested capital, and intervenors calculate a 11.21% rate of return on equity (before the rate increase), also using invested capital. The intervenor's calculations are essentially the same as the Commission's if figured after the rate increase allowed by the Commission:

The Company's calculations:
(after rate increase)
Debt at a cost of 7.49% = 3.37 (45% × 7.49)
(45% of total)
Tax deferrals at 0 cost = 0
(6.6% of total)
Equity at a cost of 8.66.% = 4.19 (48.4% × 8.66)
(48.4% of total)
Overall Rate of Return 7.56%
The Commission's calculations:
(after rate increase)
Total fair return $ 58,640,056
Amount required to
cover debt costs (7.49%) 18,246,548
 ____________
Amount available
for common equity $ 40,393,508
Debt $243,612,127
Equity $330,132,873
 ____________
Total Cost Capital $573,745,000
 $ 40,393,508
 ------------ = 12.24%
 $330,132,873
The intervenor's calculations:
(before rate increase and
Commission adjustments)
Net Operating Income (return) $ 54,888,566
Interest Charges (7.34%) 17,881,130
 ____________
Available for Common Equity $ 37,007,436
Debt $243,612,127
Equity $330,132,873
 ____________
Total Cost Capital $573,745,000
 $ 37,007,436
 ------------ = 11.21%
 $330,132,873

The Company's figure of 8.86% rate of return on equity is unclear because the Company (prior to the rate increase) acknowledged that its rate of return on average equity was 11.21% for Alabama intrastate.
Moreover, the Company argues that the rate of return on equity should be based upon that percentage of the entire rate base that is applicable to the percentage equity investment. We disagree, because this would allow the Company to receive an equity return on funds that have not yet been invested and funds that are essentially *449 free to the Company from tax deferrals. Further, the Company argues that the rate of return on equity allowed by the Commission in 1971 is more than the 8.66% rate of return on equity allowed presently (as calculated by the Company). However, this position overlooks the fact that the rate of return calculated in 1971 is based upon an entirely different rate base and income adjustments, hence they are not comparable.
After carefully reviewing the record we have found that the total average invested capital for 1974 is $573,745,000. There are differences of opinion in this case regarding the amount of invested capital but this results from an absence of hard and fast rules for allocating capital among the states composing South Central Bell. We are of the opinion that the rate of return on equity as calculated by the Commission and the intervenors is an accurate one.
It should be noted that the Commission allowed the new investment of $110,455,072 to be added to the rate base without any decrease for the approximately 43 million dollars accrued depreciation. This made the Commission's calculation of a total fair return clearly in favor of the Company. Assuming the overall rate of return remains constant, the larger the rate base the larger the amount of income realized. Since the total return is increased by the inclusion of the undepreciated new investment in the rate base, the rate increase granted is in favor of the Company. For example:

7.56% × $775,662,119 = $58,640,056 (total fair
return)
$58,640,056 - $50,445,475 = $8,194,581 (amount of
rate increase allowed after taxes)

The inclusion of an undepreciated new investment here is also a departure from many years of rate base calculations by the Company. It appears that the reason the accrued depreciation was not deducted was because of our decision in Alabama Gas Corporation v. Wallace, 293 Ala. 594, 308 So.2d 674 (1975), which held that it was not necessary to deduct this item from the new investment. However, when the new investment is actually made, we expect the Company, using generally accepted accounting procedures, will depreciate that investment. Because the accrued depreciation is allowed to remain in the new investment, a return will be earned on that accrued depreciation. As we have already noted, the Commission also allowed a downward adjustment to net operating income of $4,119,250 for wage increases that became effective in August, 1975.
Under Title 48, § 52, as amended:
The rates and charges for the services rendered and required shall be reasonable and just to both the utility and the public. Every utility shall be entitled to such just and reasonable rates as will enable it at all times to fully perform its duties to the public and will, under honest, efficient and economical management, earn a fair net return on the reasonable value of its property devoted to the public service.. . . In any determination of the commission as to what constitutes such a fair return, the commission shall give due consideration, among other things, to the requirements of the business with respect to the utility under consideration, and the necessity, under honest, efficient and economical management of such utility, of enlarging plants, facilities and equipment of the utility under consideration, in order to provide that portion of the public served thereby with adequate service. . . .
A search of the record for relevant evidence which would establish a fair overall rate of return for the Company intrastate has revealed some interesting facts. In 1974, for example, the Company's rate of return on equity, 11.21% before the rate increase, was higher than that of AT&T consolidated of 10.4%, and was also higher than 20 (including South Central Bell) of the 21 Bell Companies. Further, a Company witness, Mr. Meyer of Kidder, Peabody & Company, testified that the rate of return on average equity for South Central Bell in 1974 (all 5 states) was 9.96% and that this was the highest in its entire history. Additionally, another comparison may be made with regard to the Company's financial well-being during 1974. This comparison *450 involves the times-interest-charges ratio, which is the amount of net income divided by the interest costs. It gives the number of times that interest costs are covered by the net income, and the higher the number of times they are covered, the better the well-being of the Company. For Alabama intrastate this number was 3.01 compared to 2.80 for South Central Bell as a whole:

Times Interest Charge Calculation
(before Commission's adjustment
and rate increase)
 $54,888,566
 ----------- = 3.01
 $18,246,548

This 3.01 times-interest-coverage was higher than all but 4 of the 21 Bell Companies.
Furthermore, Alabama intrastate dividends paid by South Central Bell to AT&T increased from $23,511,835 in 1973 to $26,714,597 in 1974.
Our duty is to examine the order of the Alabama Public Service Commission on the issue of confiscation in the schedule of intrastate rates and to exercise our independent judgment on both the facts and the law. Alabama Public Serv. Com'n v. Southern Bell T. & T. Co., 253 Ala. 1, 42 So.2d 655 (1949). We have done so, and after considering the evidence we find that the order of the Alabama Public Service Commission authorizing an overall 7.56% rate of return is a just return and not confiscatory. Accordingly, the decree of the trial court must be reversed and remanded with directions to that court to enter a decree in conformity with this opinion, including the vacation of the writ of supersedeas and a refund with interest for the appropriate sums collected. It is so ordered.
REVERSED AND REMANDED WITH DIRECTIONS.
BLOODWORTH, ALMON, EMBRY, JJ., and SIMMONS, Retired Circuit Judge, sitting by designation of the Chief Justice, concur.
SHORES, J., recused.
MADDOX, J., dissents, with whom FAULKNER and JONES, JJ., concur.
MADDOX, Justice (dissenting).
The basic difference between me and the majority is whether "new investment to be added in the year immediately following the test period" should be used in determining a rate that is "reasonable and just to both the utility and the public." Title 48, Section 52, Code, as amended.
The Legislature, in 1971, during a special session, set out what the Alabama Public Service Commission must consider in setting a rate which is "reasonable and just to both the utility and the public" Act No. 97, (Acts, 1971, Vol. 1, pp. 171-172) approved May 11, 1971, amended Title 48, Section 52, to provide, in part:
"* * * For the purpose of fixing rates such reasonable value of a public utility's property shall be deemed to be the original cost thereof, less the accrued depreciation, as of the most recent date available, and the amount of the new investment to be added in the year immediately following the test period used in arriving at the value of such utility's property. In any determination of the commission as to what constitutes such a fair return, the commission shall give due consideration, among other things, to the requirements of the business with respect to the utility under consideration, and the necessity, under honest, efficient and economical management of such utility, of enlarging plants, facilities and equipment of the utility under consideration, in order to provide that portion of the public served thereby with adequate service.. . ."
The italicized portion of Act No. 97 was added to the Code section in 1971, by the Legislature, in special session.
A fair reading of Act No. 97 convinces me that "new investment to be added" must be considered in fixing a rate that is reasonable and just to the utility. As a matter of fact, the Act specifically requires:
"In any determination of the commission as to what constitutes such a fair return, the commission shall give due consideration, among other things, to the requirements of the business . . .

*451 and the necessity, under honest, efficient and economical management of such utility, of enlarging plants, facilities, and equipment of the utility under consideration, in order to provide that portion of the public served thereby with adequate service." [Emphasis added.]
Under this legislative mandate, the Commission "shall" give consideration to the necessity of "enlarging plants, facilities and equipment." The majority concedes that the basic difference between me and them is how "new investment" (which I classify as enlargement of plants, facilities and equipment) should be treated. The majority, in effect, contends that "new investment" is to be included only when calculating overall rate of return on rate base, although the statute certainly does not use those words. The effect of the majority's holding means that if a utility plans to enlarge its plants, facilities or equipment, that this "new investment to be added" has no relevancy to the question of a reasonable rate of return to equity.
In other words, the majority believes that in determining the rate of return to equity, no consideration should be given to the "reasonable value" of the company's property for any period except the test year. The majority is just wrong in this, and fails to follow the legislative mandate in rate-making.
As this Court said in Alabama Public Service Commission v. Southern Bell T. & T. Co., 253 Ala. 1, 42 So.2d 655 (1949):
"The return must be sufficient to assure the investor's confidence in the financial soundness of the utility enterprise and enough to maintain and support its credit so that it will be able to raise the money necessary to improve and expand its service in the discharge of its public duties. In the above cited case of Bluefield Waterworks Improvement Company v. Public Service Commission, [262 U.S. 679, 43 S.Ct. 675, 67 L.Ed. 1176] supra, the Supreme Court of the United States said:
`* * * The return should be reasonably sufficient to assure confidence in the financial soundness of the utility, and should be adequate, under efficient and economical management, to maintain and support its credit and enable it to raise the money necessary for the proper discharge of its public duties. * * *'
"The above principle has been amplified in succeeding decisions of the Supreme Court of the United States.
"In United Railways & Electric Company v. West, 1930, 280 U.S. 234, 250, 252, 50 S.Ct. 123, 126, 74 L.Ed. 390, 409, 410, the Supreme Court of the United States quoted as the general rule the above excerpt from the Bluefield Case. The Court defined what is necessary to assure the confidence in the financial soundness of the utility to maintain its credit by stating:
"* * * It is manifest that just compensation for a utility, requiring for efficient public service skillful and prudent management as well as use of the plant, and whose rates are subject to public regulation, is more than current interest on mere investment. Sound business management requires that, after paying all expenses of operation, setting aside the necessary sums for depreciation, payment of interest, and reasonable dividends, there should still remain something to be passed to the surplus account, and a rate of return which does not admit of that being done is not sufficient to assure confidence in the financial soundness of the utility to maintain its credit and enable it to raise money necessary for the proper discharge of its public duties.'"
It is apparent to me that this Court considers the rate of return to equity is of critical importance. It must be sufficient to attract new capital in order that the utility may continually improve its services. As the Supreme Court of the United States opined in Federal Power Commission v. Hope Nat. Gas Co., 320 U.S. 591, 64 S.Ct. 281, 88 L.Ed. 333:
"* * * From the investor or company point of view it is important that *452 there be enough revenue not only for operating expenses but also for the capital costs of the business. These include service on the debt and dividends on the stock. Cf. Chicago & G. T. R. Co. v. Wellman, 143 U.S. 339, 345, 346, 12 S.Ct. 400, 36 L.Ed. 176, 179, 180. By that standard the return to the equity owner should be commensurate with returns on investments in other enterprises having corresponding risks. That return, moreover, should be sufficient to assure confidence in the financial integrity of the enterprise, so as to maintain its credit and to attract capital. See Missouri ex rel. Southwestern Bell Tel. Co. v. Public Serv. Commission, 262 U.S. 276, 291, 43 S.Ct. 544, 67 L.Ed. 981, 986. 31 A.L.R. 807 (Mr. Justice Brandeis concurring.). . ."
Since both the Commission and the Intervenors claim that the rate of return on rate base will produce a rate of return to equity of 12.24% or 11.21%, I assume both think that a rate of return to equity in this range is reasonable and fair to the public, and to the company. In General Tel. Co. of Southeast v. Alabama Public Service Commission, Ala., 335 So.2d 151 (1976), both the Commission and the Intervenors seem to agree that a rate of return to equity of 11.05% was reasonable in that case. Unquestionably, the 7.56% rate of return on the rate base in this case will produce a 12.24% or 11.21% rate of return to equity if "invested capital" during the test year only is used as being determinative. But equity and debt capital one year after the test year will be much higher. In fact, in their reply brief, the Commission admits:
"Obviously, the equity and debt capital one year after the end of the test year is substantially greater than the average of equity and debt capital during the test year 1974. The Commission calculated the total equity and debt capital averaged over the test year 1974 as $573,745,000. If the total equity and debt capital were calculated at year end 1974, the figure would be $608,087,000. . . ." [Emphasis added.]
It is apparent to me that the rate of return is insufficient, when measured against both Alabama's statutory standard and that of the Supreme Court of the United States. Having said that, I hasten to add that the company's calculations are based upon the total of new investment, without any allowances. The total equity and debt capital projected by the company at year end 1975, (the year following the test period) is much lower than the total rate base figure and is shown by the following response of the company to an inquiry:
 "ALABAMA DOCKET NO. 16966
 Alabama Public Service Commission
 Bishop Oral Request
 Dated July 23, 1975
"Request: Breakdown of invested capital at December
 31, 1975, i.e., common equity, Job
 Development Investment Credit and debt
 applicable to the statutory rate base.
"Response:

 SOUTH CENTRAL BELL TELEPHONE COMPANY
 INTRASTATE INVESTED CAPITAL BY CLASSES
 STATE OF ALABAMA
 Estimated
 End of Period
 12-31-75
Stockholder's Equity $346,000,000
Unamortized Job
Development Investment
Credit 15,000,000 #
Total Equity Capital 361,000,000 *
Total Debt Capital 305,000,000 *
Total Invested
Capital 666,000,000

# Furnished by Mr. J. D. Matheson at the request of Mr. Bishop during cross-examination on July 17, 1975.
* See response to Bishop Request No. 1 (Request No. 2, Item 13)."
The Commission argues that the $15,000,000 item "Unamortized Job Development Investment Credit" is "neither a contribution of stockholders or debt." In any event, the total of equity and debt capital as projected by the company would be $666,000,000, not the $724,468,420 figure used by the company to arrive at its 8.66% rate of return to equity. I had some difficulty understanding how the company arrived at the 8.66% figure it used in the brief, but I *453 finally determined it used the total rate base figure.
The company's calculations (after the rate increase) if arranged as are the Commission's and the Intervenor's, in the majority opinion, would be as follows:

Total return $ 58,640,056
Amount required to cover debt
 costs [$775,662,119 (rate base)
 × 45% (debt) = $349,047,953 ×
 7.49% (debt cost) = $26,143,692] 26,143,692
 ____________
Available for Common Equity $ 32,496,364
 ============
Debt $349,047,953
Equity ($775,662,119 × 48.4%) 375,420,467
 ____________
Total Cost Capital $724,468,420
 ============
 $ 32,496,364
 ------------ = 8.66% rate of return to equity.
 $375,420,467

If the company's projected figures are used, the calculations would be as follows:

Return $ 58,640,056
Debt Cost ($305,000,000 × 7.49%) 22,844,500
 ____________
Available for Common Equity $ 35,795,556
 ============
Debt $305,000,000
Equity 361,000,000
 ____________
Total Cost Capital $666,000,000
 ============
 $ 35,795,556
 ------------ = 9.92% rate of return to equity.
 $361,000,000

The circuit court found that a floor of confiscation would be a 9% rate of return on rate base. Assuming that the debt-equity ratio would remain approximately the same, the calculations would be:

Total return ($775,662,119 × 9%) $ 69,809,591
Invested Capital $666,000,000
Interest Charges $ 22,844,500
Available for Common Equity $ 46,962,091
Amount of Common Equity $361,000,000
Rate of Return 13.01%

Three witnesses for the company testified that the return on equity, in order to allow the company a fair rate of return comparable to that being earned by others, would be in the range of 13% to 15%. The Intervenor's witness, Whatley, suggested that return to equity of 10.8%, which he adjusted downward to 9.51%, was appropriate. The Commission implicitly found that a 12.24% rate of return to equity was reasonable in view of the fact that it argues in brief that its order would provide for a return to equity of 12.24%.
Using the 12.24% rate of return to equity and the company's projections of "Stockholder's Equity" at December 31, 1975, of $346,000,000 (this sum does not include $15,000,000 Unamortized Job Development Investment Credit, which the Commission contends is not equity), then the rate of return on rate base would have to be at least 8.61658% to produce a rate of return on equity of 12.24%.
The computation would be as follows:

Total return
 ($775,662,119 × 8.61658) $ 65,194,900
Debt Cost
 ($305,000,000 × 7.49%) $ 22,844,500
 ____________
Available for Common Equity $ 42,350,400
 ============
Equity $346,000,000
Debt $305,000,000
 ____________
Total Cost Capital $651,000,000
 ============
 $ 42,350,400
 ------------ = 12.24% rate of return to equity.
 $346,000,000

I believe the trial court's finding that a 9% rate of return was necessary to prevent confiscation is erroneous. On the other hand, I believe that the majority's determination that the Commission order is just and reasonable is also erroneous and is not supported by the record, because the rate of return on rate base, which includes new investment, will not produce a 12.24% rate of return to equity unless the company's invested capital remained static, which it will not. The Commission, in fact, admits this by allowing the company to include "new investment to be added" of $110,455,972 in the rate base. I believe that the record shows that the Commission, in ordering the 7.56% rate of return on rate base did not follow the mandate of the Legislature to provide for "new investment"enlargement of facilities, etc. Therefore, I would remand the case to the Commission with directions to determine a rate of return which would take into consideration the enlargement of plants, facilities and equipment in the year after the test year.
FAULKNER and JONES, JJ., concur.