This is an appeal by General Telephone Company of the Southeast (GTSE) pursuant to the provisions of Code 1975, §37-1-140, from a utility rate order of the Alabama Public Service Commission (APSC) dated June 21, 1980.
On November 21, 1979, GTSE filed a petition for an increase in its rates and charges for intrastate telephone service, seeking an increase of $3,884,207 to allegedly enable GTSE to earn a fair net return on the reasonable value of its property devoted to public service in Alabama, enlarge plants and facilities, and continue to provide adequate service. GTSE's petition was based upon a "test period" comprised of the twelve months ending June 30, 1979. At the time of the hearings, this "test period" was updated to the year ending December 31, 1979.
Notice of intervention was filed by the Attorney General of Alabama on behalf of affected citizens of Alabama who are customers of the company.
Hearings were held before the APSC on March 4, 5, and 6, 1980, and were continued on April 21 and 22, 1980.
On June 21, 1980, the APSC entered its order, together with a separate opinion denying GTSE's proposed rates and directing the utility to file new schedules of rates and charges designed to produce additional revenues of $2.51 million annually (as opposed to $3,884,207 annually as originally sought by GTSE). Such rates (based on the test year ending December 31, 1979) were filed by GTSE on June 26, 1980, and approved by an order of the APSC dated July 2, 1980.
On July 18, 1980, GTSE filed its notice of appeal.
An appellate expert was appointed to aid and assist the Court in this case. See Code 1975, § 37-1-143; Rule 33 (A), Rules of Appellate Procedure.
Essentially the Company raised five issues on appeal:
I. Whether the return on equity of 13.5% is unjust and unreasonably low, resulting in confiscation of the Company's property.
II. Whether the Commission erred in determining the Company's revenue requirement on the basis of the allocation of the total capital of the Company to its Alabama intrastate operations rather than the Company's intrastate rate base, the effect of which would result in a return on equity of less than 13.5%.
III. Whether the reduction of the Company's "Working Capital" allowance is supported by the evidence.
IV. Whether the reduction of the Company's maintenance expenses is supported by the evidence.
V. Whether the Commission erred by disallowing the Company's deduction for "Interest During Construction" (IDC).
I. Whether the return on equity of 13.5% is unjust andunreasonably low, resulting in confiscation of the Company'sproperty.
The Court's inquiry into APSC decisions ordinarily goes no further than to ascertain whether there is evidence to support the findings of the APSC. An order of the Commission will not be overturned if supported by legal evidence of substantial weight and probative force. North Alabama Motor Express v.Rookis, 244 Ala. 137, 12 So.2d 183 (1943). Section 37-1-124
prescribes that the Commission's order shall be taken as prima facie just and reasonable and that this Court shall set aside the order *Page 1290 
only if it finds: (1) The Commission erred to the prejudice of the appellant's substantial rights in its application of law; or (2) the order, decision, or award was procured by fraud or based on facts contrary to the substantial weight of the evidence.
However, when confiscation is alleged, and properly presented on appeal, the Court must exercise a broad review to determine upon its independent judgment of both law and facts whether the rates fixed by the Commission fall within these constitutional limits. Alabama Public Serv. Comm'n v. South Central BellTelephone Co., 348 So.2d 443 (Ala. 1977) (hereinafter referred to as Bell 1977). This for the reason that the Legislature is powerless to confer upon its own agency the authority to decide constitutional issues. Alabama Public Serv. Comm'n v. SouthernBell Telephone Telegraph Co., 253 Ala. 1, 42 So.2d 655 (1949) (hereinafter referred to as Bell 1949).
Several legal principles control the determination of a fair rate of return in order to avoid confiscation.
 "I. The reasonable rate of return depends upon many circumstances. It cannot be developed by a rule of thumb calculation. It must be determined in the exercise of a fair, enlightened and independent judgment of all relevant facts.
". . . .
 "II. The rate of return must be equal to that generally being earned by others in the same general locality in business undertakings attended by corresponding risks and uncertainties. . . .
". . .
 "III. The return must be sufficient to assure the investor's confidence in the financial soundness of the utility enterprise and enough to maintain and support its credit so that it will be able to raise the money necessary to improve and expand its service to the discharge of its public duties. . . .
". . .
 "IV. In determining the reasonableness of rates it is necessary to consider the effect of the rates imposed in the light of the utility's present situation and in light of its requirements and opportunities. . . .
". . .
 "When considering confiscation, `. . . we should remember the principle that the property of a public utility, although devoted to the public service and impressed with a public interest, is still private property. . . ." [Citation omitted.] "Alabama Public Serv. Com'n v. South Central Bell, 348 So.2d 443, 446
(Ala. 1977). See, Alabama Public Serv. Com'n v. Southern Bell T. T. Co., 253 Ala. 1, 42 So.2d 655
(1949).
 "Moreover, we have noted that the effect of the applicable state statutes is to have the Public Service Commission determine utility rates under the theory of a fair rate of return based upon a fair and adequate rate base as distinguished from the cost of capital theory. South Central Bell, supra, [348 So.2d] at 446. State v. Southern Bell T. T. Co., 274 Ala. 288, 148 So.2d 229 (1962)."
Continental Telephone Co. of the South v. Alabama Public Serv.Comm'n, 376 So.2d 1358, 1361 (Ala. 1979). See, Bell 1977, 348 So.2d at 446; Bell 1949, 253 Ala. at 12-14, 42 So.2d 655.
The order of the Commission stated:
 "Two witnesses in this proceeding have made recommendations of the Company's cost of equity. Mr. Jerry N. Austin, Treasurer of the Company, testified on behalf of the Company that its cost of equity was in the range of 15.5% to 16.5%. Dr. Legler, witness for the Attorney General, found the Company's cost of equity to be in the range of 13% to 14% (Tr. p. 629). Of the two witnesses testifying, we find Dr. Legler's analysis more convincing. Before addressing Dr. Legler's analysis and our finding of the Company's cost of equity, we deem it appropriate to state why we find Dr. Austin's testimony unconvincing.
 "Mr. Austin's cost of equity recommendation was based on his assessment of current economic conditions, a DCF or *Page 1291 
discounted cash now analysis, a risk premium analysis and two `reasonableness tests.'
 "As pointed out during his cross-examination, there are several inconsistencies in Mr. Austin's assessment of current economic conditions. Mr. Austin's DCF analysis was similarly flawed. The DCF approach is a market based approach, but the Company was not traded on the market, so Mr. Austin used a composite or index of several companies as a surrogate. Testimony shows that if Mr. Austin had performed a DCF calculation for each of his "comparable companies" there would be a wide range in the costs of equity, a result one should not get if the companies were truly comparable. The Commission is of the opinion that Mr. Austin did not sufficiently establish the comparability of these companies.
 "Mr. Austin's application of the bond yield-risk premium method purported to be based on a study he had performed between realized returns on utility stocks versus utility bonds over a thirty-five year period; a study of utility stocks and bonds over an alleged period of economic stability; and a study of expected returns for the S P 400 Index over a period of years less an appropriate bond yield. However, Mr. Austin's range of risk premium was based not on his studies but the studies of others. The Commission questions the appropriateness of risk premium developed on the basis of date from a time period when interest rates were substantially different from current rates.
 "Mr. Austin's final two procedures, involved (1) examining the realized rate of return of 865 industrial and utility companies with bond ratings similar to the Company's and (2) a DCF calculation of the expected return for the S P 400 Industrial Index. We question the comparability of each group, and there has been no showing that they are comparable to the Company. As to the first sample, we note that utilities are ranked by a different method than industrials. In regard to the latter method, there has been no showing of the appropriateness of comparing one company, General Telephone Company of the Southeast, to an index or portfolio of companies, particularly industrial firms.
 "Dr. Legler's analysis used the DCF and risk premium methods in developing his cost of equity estimate. In addition, he offered a comparable earnings approach that supported his other methods. In using his market based approaches, Dr. Legler initially developed cost of equity estimates for GTE and then developed an overall cost of capital for GTE to be used as the fair rate of return on the Company's equity. In developing his comparable earnings approach, Dr. Legler did not directly consider the double leverage of the GTE system but did identify a group of comparable risk companies, some of which are part of similar holding company arrangements. Using the market-based techniques considering double leverage, Dr. Legler developed a cost of equity estimate of 13.76%. Using the comparable earnings method, Dr. Legler developed a cost of equity range of 13% to 14%.
 "Having considered the evidence summarized above . . . the Commission finds the Company's cost of equity to be 13.5%. This finding is within the range of Dr. Legler's comparable earnings approach and within the range of Dr. Legler's cost of equity of GTSE, and we feel this is just and reasonable in light of the record and current economic conditions."
In this case, the Commission had before it the testimony of two expert witnesses: one on behalf of the Company (Austin) and one on behalf of the Attorney General (Legler). The Commission found the testimony of Legler to be more convincing and found a fair rate of return on equity to be 13.5%.
In his testimony Legler expressed that his intention was to "provid[e] the Commission with a range of reasonableness with respect to the cost of equity capital [in order to permit] the Commission the flexibility of weighing other factors such as the rate base and capital structure in its decision, *Page 1292 
with the assurance that the estimate of the cost of capital is within a reasonable range." Legler presented a range of 13% to 14% as being a reasonable rate of return on equity. The Commission's decision of 13.5% was within the reasonable range of 13% to 14%.
 "`In State of Alabama et al. v. Southern Bell Telephone and Telegraph Co., 274 Ala. 288, 148 So.2d 229, we quoted the following from the book "A Telephone Rate Case" by E.D. Smith:
 "What will constitute a fair return in a given case is not capable of exact mathematical demonstration. It is a matter more or less of approximation about which conclusions may differ. . . ."
General Telephone Company of the Southeast v. Alabama PublicServ. Comm'n, 335 So.2d 151, 156-57 (Ala. 1976).
Appellant, in its brief, proposes that this Court hold as a matter of law that, because the appellant's recent cost of long-term debt exceeds the rate of return fixed on its common equity by the Commission, confiscation results. We cannot agree. Appellant cites McCardle v. Indianapolis Water Co.,272 U.S. 400, 418-419, 47 S.Ct. 144, 151, 71 L.Ed. 316 (1926), for the proposition that: "It is well settled that an equity investor will require a higher rate of return than he could achieve by investing in long-term or short-term debt." A reading of McCardle shows that the Commission found 7% to be a reasonable rate of return even though the Company through expert witnesses introduced evidence supporting higher rates of return of 7.5% to 8% and a six-month average of the rates of yield to investors on certain public utility bonds to be 7.33 percent. The Court stated: "Obviously, the cost of money to finance the whole enterprise is not measured by interest rates plus brokerage on bonds floated for only a part of the investment." 272 U.S. at 419, 47 S.Ct. at 151.
In Denver v. Denver Union Water Co., 246 U.S. 178,38 S.Ct. 278, 62 L.Ed. 649 (1918), the Court did hold that a 4.2812 percent net return was confiscatory. However, in our study of the case it appears that the Court did not grant the Company 6% on the basis that was the prevailing rate of interest for secured loans on business and residential properties in Denver. The Court only noted that the finding of the master that 6% was the prevailing rate of interest was not challenged; that the question of the rate of compensation that may be regarded as sufficient depends greatly upon circumstances and locality; and that the return yielded by the ordinance (4.2812%) was inadequate.
Even if we did interpret these cases as appellant proposes, in the exercise of "fair, enlightened judgment of all relevant factors" we cannot conclude that as a matter of law confiscation results when a company's cost of long-term debt exceeds the rate of return fixed by the Commission, because (1) economic conditions in those early days were obviously more stable than present economic conditions; (2) current inflationary trends cause prevailing rates of interest to widely fluctuate; and (3) investors place their funds for varying reasons not always related to the highest rate of return they could receive.
It is common knowledge that investors purchase debt securities to produce fixed income and purchase equity securities for the purposes of producing income and getting appreciation in value. Moreover, it is common knowledge that investors purchase equity securities that in fact produce less income than debt securities of the same business because of the prospects of enhancement of value in the future.
Considering the evidence in the record and the rules with respect to our standard of review where the issue of confiscation is presented, we are unable to find that a rate of return on common equity for this Company as determined by the Commission at 13.5% is confiscatory. This determination is not only based upon the evidence of record, but this Court also makes its finding based upon its exercise of "fair, enlightened judgment of all relevant factors." *Page 1293 
II. Whether the Commission erred in determining the Company'srevenue requirement on the basis of the allocation of the totalcapital of the Company to its Alabama intrastate operationsrather than the Company's intrastate rate base, the effect ofwhich would result in a return on equity of less than 13.5%.
The Company claims that the Commission erred by not determining the revenue requirement on the basis of a fair rate of return on the statutory rate base, but instead using the "cost of capital" theory in disregard of the mandate of our statute. The counter argument advanced by the Attorney General is simply that the Commission is not required to use any particular methods in establishing revenue requirements. Both the Company and the Attorney General cite to us the Bell 1977
case and Continental Telephone Company of the South v. AlabamaPublic Serv. Comm'n, 376 So.2d 1358 (Ala. 1979). However, at the time these cases were decided, the Alabama statute provided for the addition to the rate base of "new investment to be added" in the year following the text period. Under the law at that time, it was obvious that the statutory rate base would likely exceed capital structure. Prior to the statute authorizing the "new investment adder" in 1971, this Court inState v. Southern Bell Telephone and Telegraph Co., 274 Ala. 288, 148 So.2d 229 (1962), clearly held that:
 "As we interpret the above statutes, their effect is to have our Public Service Commission determine utility rates under the theory of a fair rate of return based upon a fair and adequate rate base, as distinguished from the so-called `cost of capital' theory for determining the rate of return."
274 Ala. at 290, 148 So.2d 229.
We hold that, as a general proposition, under our statute (Code 1975, § 37-1-80) Alabama follows the "rate base theory" in its legislative determination of revenue requirements to entitle a utility to "just and reasonable rates." The application of this principle of law is made difficult in situations where, as here, the Company does not maintain its books and records separately for computation to establish an intrastate rate base for Alabama. However, the Commission in its order found the Alabama Intrastate Rate Base to be $64,950,465. Using the methodology in dispute, the Commission allowed a rate of return on only $64,255,473, thereby reducing the amount upon which the Company is entitled to a return by $694,992. We agree with the contentions of the Company that the Commission should have determined the Company's revenue requirements based on its intrastate rate base, including its component parts.
Many of the additional arguments of the parties relate to whether these disputed methods of computations of capital structure, rate base and the determination of revenue requirements constitute confiscation as a matter of law. Because we have decided in this case that a 13.5% rate of return on equity does not result in confiscation, we see no necessity to further consider that issue here. Suffice it to say that there must be much broader considerations and a much broader judicial scope of review where the issue of confiscation is properly presented. As this Court held inAlabama Power Co. v. Alabama Public Serv. Comm'n,390 So.2d 1017 (1980):
 "The rate of return on the common equity portion of the statutory rate base is an essential and helpful computation in determining a fair rate of return on the rate base; however, the ultimate question of a fair rate of return cannot be determined by a strict adherence to a combination of the results given by such mechanical computations."
". . .
 "As stated earlier, the determination of a fair rate of return is not limited to the composite results of strict mathematical formulae. Furthermore, an examination of an order of the Commission to determine whether the rate of return is confiscatory must include an examination of all the elements of which it is composed."
390 So.2d 1024, 1025.
III. Whether the reduction of the Company's "Working Capital"allowance is supported by the evidence.
The order of the APSC stated: *Page 1294 
"RATE BASE
 "As with operating results, the Company offered the testimony of Mr. Pertler in support of its rate base. The Company claimed that the reasonable value of its property devoted to public service as of December 31, 1979, was $68,122,536 (Ex. 25). The rate base offered by Mr. Pertler included $64,677,072 of net telephone plant and $3,445,464 of working capital allowance.
 "In brief, the Attorney General has argued that the Company's rate base was overstated and should be rejected. As an alternative the Attorney General suggested a rate base of $65,757,810 composed of $64,751,647 net telephone plant and $1,006,163 working capital allowance.
 "Most of the contentions between the parties concerning rate base were associated with the allowance for working capital. The Company proposed that the Commission allow $1,276,774 of materials and supplies and $2,168,690 of cash working capital as the working capital allowance. The $1,276,744 of materials and the supplies was the intrastate portion of the December balance of the Company's combined Alabama operations. The $2,168,690 of cash working capital was one-eighth of the Company's proposed operating expenses for the test year. That one-eighth or forty-five day factor was based on a lead-lag study done for the Company's total operations in 1972 (Tr. p. 305, Ex. 44).
 "The Office of the Attorney General argued that the materials and supplies balance for December 1979 was highly overstated, that it peaked far above the average for the year, and that the balance has since dropped appreciably. Suggesting that the use of the December balance would result in an overstatement of rate base, the Attorney General urged the Commission to adopt a thirteen month average for materials and supplies.
 "The intrastate portion of that average was $1,006,163 versus the Company proposal of $1,276,774.
 "In regard to cash working capital, the Office of the Attorney General urged the Commission to disallow the entire allowance proposed by the Company. Several reasons were offered in support of their contention. It was argued that since the record showed that rate base for the Company as a whole would exceed capitalization, a prima facie showing was made that rate base was excessive and that the excess lay in cash working capital. Indeed, Mr. Pertler admitted during cross-examination that rate base and capitalization should be equal. (Tr. p. 313). Upon the demonstration by Commission staff that such a situation would not exist for the Company as a whole, Mr. Pertler suggested that capitalization would not equal rate base at a given point in time because of the dynamic nature of current liabilities (Tr. p. 861), and because of good financial management (Tr. p. 505). Those responses formed the basis for another of the Attorney General's arguments against allowing a cash working capital allowance; namely, that if indeed via the Company's financial management, the Company's cash flows were so good that non-investor supplied funds were supporting rate base, then the need for any cash working capital was a moot issue and the justification for said allowance was null and void.
 "The Attorney General offered several other reasons for disallowing the proposed allowance. It was argued that the lead-lag study on which the allowance purported to be based was deficient in two serious respects. First, that the study was dated and obsolete. Second, and more important, that the study was based on the Company's entire operations throughout the southeast and not on Alabama intrastate operations. It was also argued that the one-eighth or formula method has recently been questioned as arbitrary and inaccurate.
 "Having reviewed the positions of both of the parties, the Commission adopts the working capital allowance advocated by the Office of the Attorney General. A review of the Company's monthly balances *Page 1295 
of materials and supplies during the test year and the available months thereafter does in fact demonstrate and confirm the Attorney General's premise that the use of the December balance for materials and supplies is atypical of the test year and the months thereafter. The December balance exceeds the thirteen month average of December 1978 through December 1979 by $377,579 (Alabama Combined Operations), and is well over $100,000 higher than any balance in the first quarter of 1980 predicated on the operating reports as filed with this Commission. In adopting year end figures we must be careful not to distort the revenue-expense-investment-capital relationship. Adoption of the Company's allowance for materials and supplies would distort the investment part of that relationship.
 "As to the cash working capital, we are determined to disallow it primarily based on the arguments advanced by the Attorney General; namely, (1) the empirical data (lead-lag study) purporting to support it is dated and obsolete, having been performed in 1972 for the total Company's operations; and (2) the formulistic, 1/8 methodology is currently undergoing question by the very agency which authored it, thereby causing us to ponder whether said methodology has retained appropriateness and propriety within the present dynamics of utility rate-making. Moreover, we are impressed by the scenario wherein the Attorney General discusses the apparent inequity between rate base and capital, and attributes said difference most probably to cash working capital. We, too, are convinced that no allowance should be made for rate base which is supported by non-investor supplied funds and shall elaborate on that position in this opinion under the caption of `Capital Structure.'"
Working capital is the net investment required in a business enterprise to maintain the day-to-day operations, as opposed to investment which is committed for a longer period. According to the 1972 year-end study offered by GTSE, working capital was computed by considering compensating balance requirements, lag in the payment of invoices, advance billings, billings in arrears and customer deposits. The working capital requirement was applied to operating expenses in order to determine a ratio, thus providing a "working capital allowance" for inclusion in the rate base. This allowance is supposed to compensate investors for the use of their money in the day-to-day operations of the utility.
The working capital allowance can be divided into two segments: (1) Materials and supplies and (2) cash working capital. The attorney general recommended $1,006,163 for the materials and supplies segment versus $1,276,774 claimed by the company. The attorney general recommended zero dollars for the cash working capital segment verses $2,168,690 claimed by the company. The APSC adopted both of the attorney general's recommendations and allocated $1,006,163 for the working capital allowance. In reviewing the working capital allowance by the Commission we are faced with two questions: (1) Was the reduction of the materials and supplies segment justified and (2) can the Commission deny the company any dollar amount for the cash working capital segment? The Commission justifies its decision regarding the reduction of the material and supplies segment by declaring the amount requested by the company to be unusual and not representative of the test year. The Commission states that the monthly balance for the allowance claimed by the company exceeds the test year average monthly balance by $377,579 and is over $100,000 higher than any monthly balance in the first quarter of the year following the test year.
The justification offered by the Commission for its denial of any cash working capital is premised on the argument by the Attorney General that (1) the lead-lag study is obsolete; (2) the 1/8 formula is undergoing review; and (3) the company's rate base is greater than its capital structure. *Page 1296 
There are two principles concerning this allowance which have been recognized by this Court: (1) The working capital allowance is a proper item to include in determining the rate base, and (2) the amount of the working capital allowance to be included in the rate base is within the discretion of the APSC. See, State v. Alabama Public Serv. Comm'n, 293 Ala. 553, 572,307 So.2d 521 (1975).
While the determination of a final amount for each segment of the working capital allowance lies within the discretion of the APSC, it cannot exercise this discretion in an arbitrary way. The Commission's reduction of the materials and expense segment was justified because the actual requirements for the first quarter of 1980 show that the allowance requested was excessive. However, we find that the Commission acted arbitrarily and thus abused its discretion by denying the company any dollar amount for its cash working capital.
IV. Whether the reduction of the Company's maintenanceexpenses is supported by the evidence.
The Commission's order stated:
 "[W]e note with concern the atypical balance of the fourth quarter, used in most instances to annualize expenses. The annualization of maintenance expenses using this methodology appears to particularly skew the proposed maintenance expenses, based on a review of the average monthly maintenance expense via the Company's monthly operating reports for the test period. (Said reports were identified as Exhibit 43 in this proceeding.) We have further taken administrative note of the monthly operating reports filed with this Commission subsequent to the test year and find that maintenance expenses incurred subsequent to the test period's end, still do not parallel, on an annualized basis, the proposed maintenance expense level at test period end. As in the case of the Materials and Supplies account we are of the opinion that an average balance should be used for rate-making purposes if a month-end or quarter-end balance would be distortive or misrepresentative of the period on which we intend to predicate rates. Our review of the expense annualizations indicates that misrepresentative annualization of the maintenance expenses would tend to have the most impacting affect on the revenue-expense relationship of the test period, as they constitute a major expense item. Accordingly, we have deemed it proper to adjust for this overstatement by annualizing maintenance expenses using a thirteen month average as a base."
The test year is supposed to be representative of the future period for which the rates being considered are likely to be in effect. Annualizations of expenses are made in order to properly reflect the expense levels actually incurred during the test year, including the fourth quarter. The company presented its expenses which were actually incurred during the test year. There was no evidence that these expenses resulted from inefficiency, waste, or bad-faith or were extraordinary items. The APSC simply looked at expenses incurred prior to the test year and concluded that the increase of the expenses in the test year was unjustified. This was not proper. "Only where affirmative evidence is offered challenging the reasonableness of the operating expenses incurred, on the ground that they are exorbitant, unnecessary, wasteful, extravagant, or incurred in the abuse of discretion or in bad faith, or are of a nonrecurring character not likely to recur in the future, has the Commission a reasonable discretion to disallow any part of the expenses actually incurred." Bell 1949, 253 Ala. at 23-24,42 So.2d 655. In this case GTSE presented its annualized expenses, the APSC did not affirmatively show any valid legal reason for their disallowance, and, therefore, the APSC erred.
V. Whether the Commission erred by disallowing the Company'sdeduction for "Interest During Construction" (IDC).
The Commission in its order stated: *Page 1297 
 "[W]e are not convinced that there are cogent reasons for departing with past precedent of this Commission relative to treatment of IDC. Said finding is consistent with the predicate we laid in Docket 17743, involving this jurisdiction's largest telephone company. The effect of our decision, to maintain our previously approved accounting treatment for IDC, would be an additional $102,758 of IDC for Alabama operations (Tr. 471). The intrastate portion of that amount is $74,569 and should be added back to net telephone plant investment to insure that treatment of IDC is consistent with the past practice of this Commission."
The APSC erred when it reversed GTSE's accounting treatment of $74,569 of short-term "Interest During Construction" (IDC), which GTSE had expensed rather than capitalized. The purpose of IDC is to capitalize interest on funds used in construction because some economic benefit accrues to future ratepayers from these expenditures. The FCC Uniform System of Accounts was changed, effective January 1, 1979, whereby the capitalization of interest charged on short-term construction projects or on projects of less than $25,000 was discontinued. If the expenses are based upon data taken from its books and records kept in the regular and ordinary course of business, the accounts of the Company being kept in strict accordance with the Uniform System of Accounts prescribed by the Federal Communications Commission, these expenses should be accepted as correct. Bell1949, 253 Ala. at 10-11, 42 So.2d 655. Code 1975, § 37-1-54, gives the APSC the authority to establish a uniform system of accounts. The APSC exercised this statutorily delegated power by the adoption of Section 3 (c) of its rules and regulations, wherein it adopted the FCC Uniform System of Accounts. Thus, unless the APSC affirmatively modifies its rules regarding the FCC Uniform System of Accounts, it must allow utilities to use the rules, including amendments. The purpose of the rules is to provide uniformity and thus provide consistent accounting procedure. The APSC should respect the amendments or modify its rules accordingly. Since there is nothing in the record to indicate any action by the Commission allowing a modification of the FCC rules, GTSE properly expensed these IDC items.
AFFIRMED IN PART, REVERSED IN PART, AND REMANDED FOR FURTHER PROCEEDINGS CONSISTENT WITH THIS OPINION.
FAULKNER, ALMON, SHORES, EMBRY, BEATTY and ADAMS, JJ., concur.