390 So.2d 1017 (1980)
ALABAMA POWER COMPANY
v.
ALABAMA PUBLIC SERVICE COMMISSION.
Charles A. GRADDICK, as Attorney General, etc.
v.
ALABAMA PUBLIC SERVICE COMMISSION.
R. S. CROWDER
v.
ALABAMA PUBLIC SERVICE COMMISSION.
ALABAMA METALLURGICAL CORP. et al.
v.
ALABAMA PUBLIC SERVICE COMMISSION.
Nos. 78-880, 78-834, 78-849 and 78-881.
Supreme Court of Alabama.
August 22, 1980.
*1019 Robert E. Steiner, III and Rodney O. Mundy of Steiner, Crum & Baker, Montgomery, and John Bingham and S. Eason Balch, Jr. of Balch, Bingham, Baker, Hawthorne, Williams & Ward, Birmingham, for Alabama Power Co.
Charles A. Graddick, Atty. Gen., and Wendell Cauley, Charles A. Guyton and Thomas F. Parker, IV, Asst. Attys. Gen., for Charles A. Graddick, as Atty. Gen.
R. S. Crowder, Birmingham, for appellant R. S. Crowder.
Stanley Weissman and Robert John Varley, Legal Services Corp., Montgomery, for appellees, R. C. Gray and Lillian Bilbro, in Nos. 78-880, 78-834, and 78-849 and 78-881.
Patricia K. Olney of Pillans, Reams, Tappan, Wood, Roberts & Vollmer, Mobile, for Ala. Metallurgical Corp. et al.
EMBRY, Justice.
The four appeals dealt with in this opinion are brought by Alabama Power Company, Charles A. Graddick (as Attorney General), R. S. Crowder, and the members of what is referred to as the Alabama Industrial Group, from an order of the Alabama Public Service Commission finding that Alabama Power Company had a revenue deficiency of $208,347,398 for a twelve month test period ending November 30, 1978. Those appeals are taken pursuant to § 37-1-140, Code 1975, which provides for direct appeals to the Supreme Court of Alabama, as a matter of right, from orders of the Alabama Public Service Commission.
Alabama Power Company (APCO) initiated these proceedings by filing new schedules of retail electric rates with the Alabama Public Service Commission (the Commission) on December 20, 1978. The proposed rate schedules were designed to produce an additional revenue of $288,797,952, based on a test year period ending November 30, 1978. On January 9, 1979, the Commission suspended the filed rates through July 19, 1979, the maximum suspension allowed by law.
Pursuant to APCO's request, the Commission conducted six days of hearings on APCO's petition for emergency rate relief. By order dated March 6, 1979, the Commission granted APCO an emergency rate increase of 9.5%.
Long and arduous hearings on APCO's request for a permanent rate increase began on April 16, 1979. They were conducted in several sessions and the record was not closed until June 26, 1979.
During the proceedings, including the emergency rate increase hearings, the Commission received numerous petitions to intervene. The following were allowed to intervene and participate in the proceeding: the Attorney General; Elizabeth Jordan, Bessie Prince, R. C. Gray, and Lillian Bilbro; the Alabama Black Caucus on Aging; the Alabama League of Aging Citizens, Inc.; John Paul Ripp; General Services Administration; Candice J. Muehlbauer; Alabama Utilities Consumer Association, Inc.; Retired Iron and Steel Workers Union; R. S. Crowder; Airco, Inc., Alabama Metallurgical Corp., Ciba-Geigy Corporation, Courtaulds North America, Inc., Diamond Shamrock Corporation, Ideal Basic Industries, Inc., Kimberly-Clark Corporation, Monsanto Company, Ohio Ferro-Alloys, Olin Corporation, Stauffer Chemical Company, Uniroyal, Inc., and Union Carbide Corporation (the thirteen latter named industrial corporations are known collectively as the Alabama Industrial Group).
On April 19, 1979, an attorney for the Alabama Industrial Group made an oral *1020 motion that the Commission separate the proceedings into two phases; the first to be limited to a determination of APCO's rate deficiency and the second to be for consideration of rate design issues under that act of the Congress of the United States known as the Public Utility Regulatory Policies Act of 1978 (PURPA). After several sessions of the hearing regarding the permanent rate increase request, the Commission granted the Industrial Group's motion in an order that stated, inter alia:
"While recognizing the need to address PURPA considerations, the Commission notes that under State law it must issue an order on the proposed increased rates filed by Alabama Power by or before the suspension deadline of July 19, 1979, lest the rates go into effect as filed. The Commission will issue such an order upon the voluminous evidence now in the record and yet to be put into the record. It will then hold this docket open and, upon the public notice mentioned above and after hearing on a schedule prescribed by the Commission, will make the determination required by PURPA Sections 111 and 112. This determination will be made upon the full record in this docket and upon other records, if any, determined to be appropriate under PURPA Section 112. Consideration of standards set forth in PURPA sections other than Section 111(d) may be made a part of this docket upon the aforementioned notice-or upon a later notice as deemed advisable by the Commission."
As a result of this ruling, the presentation of testimony and exhibits on rate design was postponed to a time when PURPA rate design standards could be considered in necessary detail after proper notice of such consideration could be given. Subsequent to this ruling, the Industrial Group attempted to introduce testimony and exhibits on the question of rate allocation. Much of this evidence dealt with the fact that, under the current rate design, it has been more profitable for APCO to serve its industrial customers than its residential customers. The contention is that this is reflected in the rates of return earned by APCO on the respective customer classes. The Commission refused to admit this evidence. Other testimony and exhibits presented by other intervenors concerning rate allocation were also excluded by the Commission.
During the proceedings APCO presented evidence that the statutory rate base applicable to retail electric service[1] was $3,500,095,093. The Commission adopted this figure as being correct because it conformed with its own precedent.
The Attorney General produced expert testimony indicating the statutory rate base, as proposed by APCO, should be reduced by making two adjustments to the proposed figure. These were: (1) Reduce APCO's proposed allowance for working capital because it was excessive; and (2) Deduct $7,755,152 accumulated deferred taxes, and $8,050,143 pre-1971 investment tax credit accruals, from the rate base. One of the Attorney General's experts also proposed to increase the rate base figure by reducing the accumulated provision for depreciation. APCO produced expert testimony to the effect that such adjustments should not be made.
APCO also produced expert testimony that set its net operating income at $144,882,041. Again, the Commission accepted this figure as being correct; however, it added $146,061 to the figure because it determined APCO paid excessive executive salaries. Total operating income for the test year period was determined by the Commission to be $192,881,227 after adding the below-the-line item of allowance for funds used during construction (AFUDC).
The Attorney General presented expert testimony to the effect that APCO's proposed net operating income figure should be larger. The Attorney General's witnesses proposed the following increases to net operating income: (1) Test period revenues *1021 should be increased to adjust for the annualized effect of the end-of-period level sales; (2) Test period revenues should be increased to offset an overstatement by APCO in its proposed revenue adjustment of the effect of test period weather conditions on base rates to that of normal weather conditions, and to properly reflect normal test year demand conditions; (3) Increase net operating income to reflect a positive net return from salvage of equipment; (4) Increase operating income by eliminating charitable contributions as an operating expense; (5) Increase test period income by reducing APCO's provision for deferred income taxes to take into account the reduction, on January 1, 1978, of the corporate income tax from 48% to 46%; and (6) Increase test period operating income to adjust the allowance for funds-used-during-construction income offset so that it fully offsets all construction-work-in-progress funds that were included in the rate base. APCO's expert witnesses testified in support of the proposed figure for net operating income and against the adjustments proposed by the expert witnesses of the Attorney General and various other intervenors.
A voluminous amount of evidence was presented during the proceedings concerning what percentage rate constitutes a just and reasonable return on APCO's common equity. Five expert witnesses, whose qualifications are not questioned, testified and made recommendations to the Commission regarding the return APCO should receive on its common equity. Those witnesses are listed below, together with their respective recommendations as to a proper return on common equity. The party on whose behalf each testified is also shown.

 Rate of Return
 On Common Equity
Expert Witness Recommendation Testified For
Mr. Charles A. Benore 15.5% Alabama Power Co.
Dr. Eugene F. Brigham 15% Alabama Power Co.
 Executive Agencies of
Dr. E. Jeffery Livingston 13.65% the U. S. Government
Dr. Caroline M. Smith 13.3% Attorney General
 Alabama Public
Dr. John B. Legler 13%-13.25% Service Commission

A sixth purported expert witness, one Dr. Ignatin, appeared on behalf of four individual intervenors represented by Legal Services Corporation, Inc. Dr. Ignatin's credentials as an expert on fair rate of return on common equity are very questionable. He testified on cross-examination that: (1) He had not made any study to determine APCO's revenue requirements; (2) He had not made any study to determine current investor expectations with respect to returns on equity; (3) He had never performed a price book progression study; (4) He had never testified about cost of capital or rate of return in any rate proceeding; (5) He had no work experience with any utility, regulatory agency, or financial institution, involving the marketing or underwriting of utility securities; (6) He had little or no knowledge of indenture or charter coverage requirements; (7) He was completely unfamiliar with SEC regulations respecting the issuance of securities of either APCO or the Southern Company; and (8) he was not an expert on cost of capital, finance, or accounting matters. Despite his demonstrated lack of expertise, Dr. Ignatin testified APCO should be allowed a return on common equity of between 8% and 14%.
On July 19, 1979, the Commission issued an order (Appendix A) finding a revenue deficiency in the amount of $208,347,398, based upon the test year. The deficiency was calculated and based upon an allowed rate of return on common equity of 11.7% *1022 and on a rate base of $3,500,095,093.[2] Calculation of the deficiency made use of the figure for retail electric operating income as proposed by APCO except for a minor adjustment of $146,061 for excessive executive salaries. With this minor adjustment and the adjustment for the allowance for funds used during construction, retail electric operating income was determined to be $192,881,227.
The order of the Commission approved a three-step "phased-in" rate increase. The first step, a 9.5% increase, was a confirmation of the Commission's previously granted emergency rate increase. The second step was an additional 5% increase effective for service rendered on and after July 19, 1979. The third step was an additional 8% increase to become effective for service rendered on and after January 1, 1980. This court, on October 19, 1979, granted partial supersedeas to allow APCO to begin collecting the 8% increase immediately.

I
The initial issue in the appeal taken from the Commission's order by the members of the Industrial Group is: Should the appeal be dismissed for lack of jurisdiction because it was filed forty days after the Commission entered its order?
APCO has filed a motion to dismiss the Industrial Group's appeal on the ground that it was filed too late. The gist of APCO's argument is that the right to appeal to this court from an order of the Commission is purely a statutory one provided exclusively by § 37-1-140, Code 1975, which states:
"In all cases involving controversies respecting rates and charges of telephone companies or public utilities, an appeal from any action or order of the Alabama public service commission in the exercise of the jurisdiction, power and authority conferred upon it by this title, as amended and supplemented, shall lie directly to the supreme court of Alabama. All such appeals shall be given a preferred setting in the supreme court and shall be heard and determined by said court en banc. Nothing in this subdivision 2 shall be deemed to apply to any such cases other than those in which rates and charges are involved. All such appeals shall be taken within 30 days from the date of such action or order of the Alabama public service commission and shall be granted as a matter of right and be deemed perfected by filing with the public service commission a bond for the security of the cost of said appeal when the appellant is a utility or person, and by filing notice of an appeal when the appellant is the state of Alabama." (Emphasis added.)
APCO argues that, since the Commission is a creature of statute, the right to appeal from an order of the Commission is based solely on the statutory grant of the right to appeal. APCO further argues the above quoted statute requires all direct appeals to this court be filed within thirty days, as a jurisdictional requirement. APCO, therefore, contends the Industrial Group's appeal must be dismissed for lack of jurisdiction because the appeal was filed forty days after the Commission issued its order.
The Industrial Group contends § 37-1-140 merely shortens the forty-two day period for filing an appeal which is set forth in Rule 4(a)(1), ARAP, and leaves the fourteen day period for filing a cross-appeal, set forth in Rule 4(a)(2), ARAP, operative. We agree and hereby deny the motion to dismiss the appeal of the Industrial Group.
Careful reading of the statutes controlling appeal from the Public Service Commission reveals incorporation of all the Alabama Rules of Appellate Procedure not superseded by specific statutory provision. Section 37-1-141, sets down the permissible parties and establishes the manner of appeal.
"Either party or any intervenor may appeal to the supreme court from the action or order of the commission under *1023 the same rules and regulations and in the same manner and under the same conditions as are or may be provided by law for appeals from circuit courts in other public utility cases." Code 1975, § 37-1-141.
Code 1975, § 37-1-144 governs construction of § 37-1-141: "The provisions of this subdivision 2 are cumulative and supplemental and shall be construed in pari materia with other laws regulating appeals from actions or orders of the public service commission * * *."
In view of §§ 37-1-141 and 37-1-144, § 37-1-132 controls the case before us: "Any party may appeal to the supreme court of Alabama from the judgment of the circuit court of Montgomery county. * * * Except as otherwise provided in this division, the appeal to the supreme court shall be taken in accordance with the Alabama Rules of Appellate Procedure." Code 1975, § 37-1-132. Time for appeal is shortened by § 37-1-140, but the statutes set no time limitation for cross-appeals. Since no specific statutory provision otherwise provides, Rule 4(a)(2), ARAP applies, and we conclude the Industrial Group appeal was timely.

II
The dispositive issue here raised by APCO, the Attorney General, and Crowder, is whether the findings of the Commission are arbitrary because they are not based upon or supported by, the evidence. We find that the Commission ignored the evidence and arbitrarily found a rate deficiency of $208,347,398. The issue presented by the Industrial Group is whether the rate order arbitrarily discriminates against industrial customers of APCO, and when entered without opportunity of the Industrial Group to present evidence regarding rate allocation, members of the group were denied due process of law.
APCO argues in its appeal that its property is being confiscated in violation of the Fifth and Fourteenth Amendments of the Constitution of the United States, Sections 6 and 13 of the Constitution of the State of Alabama of 1901, and § 37-1-80 of the Code of 1975, because it is not being allowed a just and reasonable return on its property devoted to public service. APCO contends that the Commission erred in finding that it was only entitled to an 11.7% return on its common equity. APCO argues that all the competent expert evidence presented at the hearings before the Commission indicated that APCO was entitled to a substantially higher return on its common equity; thus, the Commission's finding as to return on common equity was not based on the evidence, results in an inadequate rate of return on the statutory rate base, and is, therefore, confiscatory. We agree the Commission's order is not supported by the evidence.
As mentioned earlier, five competent experts testified as to what percentage of return on common equity APCO should be allowed to earn. The lowest figure submitted by any one of these was 13%, the figure testified to by Dr. John Legler, the Commission's own witness. Even the Attorney General's witness, Dr. Caroline Smith, testified APCO should be allowed a return on common equity of 13.3%. The only witness whose testimony would possibly support the commission's allowance of 11.7% was an intervenor's witness, Dr. Ignatin, who recommended a range of from 8% to 14%.
Dr. Ignatin's testimony is of no probative value regarding what APCO's proper return on common equity should be because he admitted on cross-examination: (1) he was not an expert on cost of capital, finance and accounting matters and (2) he knew little about SEC regulations pertaining to APCO and Southern Company or about numerous other areas essential to predicting a proper return on common equity. This being the case, there is no competent evidence which supports the Commission's finding that APCO should only earn an 11.7% return on common equity. The Commission, in effect, ignored the evidence and arbitrarily found the proper rate of return on common equity should be 11.7%. The Commission evidently justified this disregard of the evidence because of the rising cost of consumer *1024 goods and services and the President's wage-price guidelines. This was error and we must, therefore, remand.
By statute, APCO is entitled to earn a just and reasonable return on its property devoted to public service. Section 37-1-80, Code 1975, states:
"The rates and charges for the services rendered and required shall be reasonable and just to both the utility and the public. Every utility shall be entitled to such just and reasonable rates as will enable it at all times to fully perform its duties to the public and will, under honest, efficient and economical management, earn a fair net return on the reasonable value of its property devoted to the public service. For the purpose of fixing rates, such reasonable value of a public utility's property shall be deemed to be the original cost thereof, less the accrued depreciation, as of the most recent date available. In any determination of the commission as to what constitutes such a fair return, the commission shall give due consideration among other things to the requirements of the business with respect to the utility under consideration, and the necessity, under honest, efficient and economical management of such utility, of enlarging plants, facilities and equipment of the utility under consideration, in order to provide that portion of the public served thereby with adequate service."
This court on numerous occasions has listed several legal principles which control the determination of a fair rate of return in order to avoid confiscation. They are:
"I. The reasonable rate of return depends upon many circumstances. It cannot be developed by a rule of thumb calculation. It must be determined in the exercise of a fair, enlightened and independent judgment of all relevant facts....
"II. The rate of return must be equal to that generally being earned by others in the same general locality in business undertakings attended by corresponding risks and uncertainties....
. . . . .
"III. The return must be sufficient to assure the investor's confidence in the financial soundness of the utility enterprise and enough to maintain and support its credit so that it will be able to raise the money necessary to improve and expand its service to the discharge of its public duties....
. . . . .
"IV. In determining the reasonableness of rates, it is necessary to consider the effect of the rates imposed in the light of the utility's present situation and in light of its requirements and opportunities....
. . . . .
"When considering confiscation, `... we should remember the principle that the property of a public utility, although devoted to the public service and impressed with a public interest, is still private property. ...' [Citation omitted.]
"Alabama Public Serv. Com'n v. South Central Bell, 348 So.2d 443, 446 (Ala. 1977). See Alabama Public Serv. Com'n v. Southern Bell T. & T. Co., 253 Ala. 1, 42 So.2d 655 (1949)." Continental Telephone Company of the South v. Alabama Public Service Commission, 376 So.2d 1358, 1361 (Ala.1979).
The rate of return on the common equity portion of the statutory rate base is an essential and helpful computation in determining a fair rate of return on the rate base; however, the ultimate question of a fair rate of return cannot be determined by a strict adherence to a combination of the results given by such mechanical computations. Continental Telephone Company of the South v. Alabama Public Service Commission, supra; Alabama Public Service Commission v. South Central Bell Telephone Co., supra. In any event, the Commission is to determine a fair and just return after an evidentiary hearing, and the rate of return finally determined must be based upon findings supported by the evidence adduced at that hearing. Alabama Public Service Commission v. Southern Bell Tel. & Tel. Co., supra.
*1025 In this case the Commission's finding as to the proper rate of return to be allowed APCO on its common equity is not supported by the evidence. This court has made it clear in previous rate cases that this court must set aside an order of the Commission as being arbitrary as a matter of law, and a denial of due process, when such order is based upon findings without evidence to support them. See Alabama Public Service Commission v. Southern Bell Tel. & Tel. Co., supra. Because the finding in the Commission's order regarding return on common equity lacks support by any competent evidence, we must remand.
Because we have determined the Commission's finding concerning the proper return on common equity is not supported by the evidence, APCO would have this court affirm the Commission's findings regarding rate base and operating income. APCO argues that this court's standard of review is more limited concerning those findings. It argues that we must treat the Commission's findings concerning statutory rate base and operating income as prima facie just and reasonable and affirm these findings because there was substantial evidence presented at the hearings to support the Commission's findings in that regard. We disagree.
We fully agree with APCO that there are two different standards of review that apply to rate cases, depending on what issues are raised in the appeal. See General Telephone Company of the Southeast v. Alabama Public Service Commission, 335 So.2d 151 (Ala.1976). A limited scope of review exists when the action is within the Commission's scope of authority, and this court's inquiry ordinarily goes no further than to ascertain whether there is evidence to support the Commission's findings. Id. Indeed, presumptions are generally indulged in favor of the orders of the Commission, the major presumption being that the Commission's order is prima facie just and reasonable. See State v. Alabama Public Service Commission, 293 Ala. 553, 307 So.2d 521 (1975); Alabama Gas Corporation v. Wallace, 293 Ala. 594, 308 So.2d 674 (1975). In contrast, a much broader scope of review of the Commission's orders is required when confiscation is alleged; in that event, this court must exercise its own independent judgment on the facts and the law. General Telephone Company of the Southeast v. Alabama Public Service Commission, supra.
In this case confiscation is alleged; therefore, our scope of review requires a broad analysis of the evidence with no presumption of correctness. APCO, however, contends this broad scope of review should only apply to the issue of return on common equity because that was the only issue raised in its appeal and it is the only party that can raise the issue of confiscation. This is a clever argument, but it does not survive close scrutiny.
It is true that APCO is the only party to this proceeding that can raise the issue of confiscation and, thus, invoke the broader scope of review. See Alabama Gas Corporation v. Wallace, supra; City of Birmingham v. Southern Bell Tel. & Tel. Co., 234 Ala. 526, 176 So. 301 (1937). APCO, however, did raise the issue of confiscation and thus invoked that broader scope of review. If we accepted APCO's argument, we would in effect be limiting our determination of whether APCO was being allowed a fair rate of return on its property devoted to public service to an examination of one narrow aspect of the issue of fair rate of return. As stated earlier, the determination of a fair rate of return is not limited to the composite results of strict mathematical formulae. Furthermore, an examination of an order of the Commission to determine whether the rate of return is confiscatory must include an examination of all the elements of which it is composed. See Alabama Public Service Commission v. Southern Bell Tel. & Tel. Co., supra. This principle was set forth by the United States Supreme Court in Federal Power Commission v. Hope Natural Gas Co., 320 U.S. 591, 602, 64 S.Ct. 281, 287, 88 L.Ed. 333 (1943), in which Justice Douglas wrote:
"We held in Federal Power Commission v. Natural Gas Pipeline Co., supra, that the Commission was not bound to the use *1026 of any single formula or combination of formulae in determining rates. Its ratemaking function, moreover, involves the making of `pragmatic adjustments.' Id., 315 U.S. [575] at page 586, 62 S.Ct. [736] at page 743, 86 L.Ed. 1037. And when the Commission's order is challenged in the courts, the question is whether that order `viewed in its entirety' meets the requirements of the Act. Id., 315 U.S. at page 586, 62 S.Ct. at page 743, 86 L.Ed. 1037. Under the statutory standard of `just and reasonable' it is the result reached not the method employed which is controlling. Cf. Los Angeles Gas & Electric Corp. v. Railroad Commission, 289 U.S. 287, 304, 305, 314, 53 S.Ct. 637, 643, 644, 647, 77 L.Ed. 1180; West Ohio Gas Co. v. Public Utilities Commission (No. 1), 294 U.S. 63, 70, 55 S.Ct. 316, 320, 79 L.Ed. 761; West v. Chesapeake & Potomac Tel. Co., 295 U.S. 662, 692, 693, 55 S.Ct. 894, 906, 907, 79 L.Ed. 1640 (dissenting opinion). It is not theory but the impact of the rate order which counts. If the total effect of the rate order cannot be said to be unjust and unreasonable, judicial inquiry under the Act is at an end. The fact that the method employed to reach that result may contain infirmities is not then important. Moreover, the Commission's order does not become suspect by reason of the fact that it is challenged. It is the product of expert judgment which carries a presumption of validity. And he who would upset the rate order under the Act carries the heavy burden of making a convincing showing that it is invalid because it is unjust and unreasonable in its consequences. Cf. Railroad Commission v. Cumberland Tel. & T. Co., 212 U.S. 414, 29 S.Ct. 357, 53 L.Ed. 577; Lindheimer v. Illinois Bell Tel. Co., supra, 292 U.S. [151] at pages 164, 169, 54 S.Ct. [658] at pages 663, 665, 78 L.Ed. 1182; Railroad Commission v. Pacific Gas & E. Co., 302 U.S. 388, 401, 58 S.Ct. 334, 341, 82 L.Ed. 319."
The figure arrived at as operating income and the figure arrived at as the statutory rate base are as significant elements in determining a fair rate of return as is the amount of return on common equity; none of these figures can be ascertained with mathematical certainty because each includes judgmental values.
In any event, the standard of review to be applied in this case is not really important to the outcome of these appeals because we have determined the Commission's findings concerning rate of return on common equity are arbitrary and not based on the evidence. We cannot presume the rest of the Commission's order concerning rate base and operating income is based on the evidence when it is clear the Commission totally disregarded that evidence in other parts of its order. In fact, it appears from the Commission's order that it based its findings concerning rate base and operating income on the precedential value of its prior orders instead of on the evidence presented in this case. This was improper.
In State v. Alabama Public Service Commission, supra, this court clearly held the doctrines of stare decisis and res judicata do not apply to decisions of administrative agencies such as the Commission, although consistency is essential if arbitrariness is to be avoided. The Commission erred by attempting to apply precedent as the determining factor in its acceptance of the figures proposed by APCO for its operating income and rate base. The Commission should have examined the abundant evidence presented regarding these items and based its findings solely on that evidence. It is possible the Commission did this; however, we cannot determine whether it did, or did not, base its findings in that regard on that evidence. However, it is quite clear that the Commission totally ignored the evidence pertaining to return on common equity. We do not hold that the adjustments to rate base and operating income proposed by the Attorney General should be made; however, we are stating that the evidence presented by the Attorney General and other intervenors, as well as the evidence presented by APCO, should be examined, weighed, and considered.
Although the Commission apparently accepted APCO's figure for operating income *1027 because of some unstated precedent established by the Commission over the years for calculating operating income, it blatantly ignored the precedent established by this court in Alabama Power Co. v. Alabama Public Service Commission, 359 So.2d 776 (Ala.1978). In that case a majority of this court held that charitable contributions made by a utility are not properly treated as an operating expense. Despite this holding the Commission summarily disallowed the Attorney General's proposed adjustment to operating income by elimination of charitable contributions as operating expenses.
In its order the Commission did not directly address the proposed adjustment to operating income to eliminate charitable contributions. Instead the Commission dismissed almost all proposed adjustments to operating income by making the following cursory statement:
"Numerous adjustments to operating income were proposed by parties of record. We find these adjustments not to be well founded and are inconsistent with the past action of this Commission. There is no compelling evidence of record which would justify our departing from precedent in regards to treatment of operating income except the following adjustment [adjustment for excess executive salaries] of the Commission."
The Commission's treatment of the charitable contribution adjustment and blatant disregard of this court's mandate in 359 So.2d 776 (1978) further strengthens our finding that the Commission apparently failed to examine the evidence presented by the Attorney General regarding the proposed adjustments to the rate base and operating income. In the case of the proposed charitable contributions adjustment to operating income, it is apparent the Commission ignored the law as well as the evidence.
The fixing of a fair rate of return is within the exclusive province of the legislature or its agency: the Public Service Commission. Alabama Public Service Commission v. South Central Bell Telephone Co., supra. The court's function is to confine the exercise of this legislative power to constitutional limits, and it is not the function of the court to make rates or substitute its judgment for that of the legislative agencies. City of Birmingham v. Southern Bell Tel. & Tel. Co., supra. In this case the Commission abdicated its duty and ignored the evidence in fixing APCO's rates. We cannot, in this appeal, fix the proper rate of return, the operating income, or the statutory rate base. Should we do so, it would be an invasion of the province of the legislature. Neither can we state that the Commission's determination that APCO suffered a $208,347,398 rate deficiency was erroneous. We do not know whether the Commission's findings regarding rate base and operating income are based on the evidence or not. We cannot presume they were. We can, and do, however, remand the case to the Commission with the admonition that it enter an order based on the evidence and thereby meet its statutory obligation to the public.
One subsidiary issue that should be addressed is whether or not the Commission has the authority to increase rates in phases. We determine that it does not.
There is no authority found in the statutes that permits the Commission to phase in a rate increase. It is the Commission's duty to set rates and charges for the services rendered by APCO which are just and reasonable to both APCO and the public. APCO is entitled to such just and reasonable rates as will enable it at all times to fully perform its duties to the public and will, under honest, efficient and economical management, earn a fair net return on the reasonable value of its property devoted to the public service. § 37-1-80, Code 1975. If the Commission determines a utility has a rate deficiency, it has a duty to remedy that deficiency. The fact that the Commission's order will eventually remedy an existing deficiency does not validate the order. As was stated by the United States Supreme Court in West Ohio Gas Co. v. Public Utilities Commission of Ohio, 294 U.S. 79, 83, 55 S.Ct. 324, 325, 79 L.Ed. 773 (1935): "[P]resent confiscation is not atoned for by merely holding out the hope of a better life to come." The Commission cites the President's *1028 wage-price guidelines as authority for phasing in the rate increase; however, such guidelines are entirely voluntary and, as the Commission stated in its order, APCO is exempt from those guidelines.
Other issues raised by the parties to these appeals are either without merit and need not be considered or are pretermitted from consideration because of our resolution of the dispositive issues involved in these appeals. The evidence is unchallenged that APCO was suffering some degree of rate deficiency at the time it initiated these proceedings; therefore, the supersedeas bond will remain in effect until the Commission enters an order consistent with this opinion.
For the reasons assigned, these causes are remanded for further proceedings not inconsistent with this opinion, including the opportunity for the Industrial Group to present evidence regarding rate allocation. Pending those further proceedings it is hereby ordered that the supersedeas bond previously filed by Alabama Power Company will remain in full force and effect.
REMANDED WITH DIRECTIONS.
BLOODWORTH, FAULKNER and ALMON, JJ., concur.
BEATTY, J., concurs in the result.
TORBERT, C. J., with whom SHORES, J., joins, concurs specially, in part, and dissents in part.
MADDOX, J., concurs specially in part, and dissents in part.
JONES, J., concurs in part and dissents in part.
MADDOX, Justice (concurring specially, in part; dissenting, in part).

I
There are four appeals dealt with in the opinion. I will address each.
I concur in that portion of the opinion which reverses the order of the APSC with regard to the appeals made by Alabama Power Company and R. S. Crowder.
I concur in that portion of the opinion which deals with the order of the APSC in the cross-appeal by the Alabama Industrial Group.
I dissent from that portion of the opinion which remands to the APSC the appeal by the Attorney General. The opinion states:
"* * * We cannot presume the rest of the Commission's order concerning rate base and operating income is based on the evidence when it is clear the Commission totally disregarded that evidence in other parts of its order. In fact, it appears from the Commission's order that it based its findings concerning rate base and operating income on the precedential value of its prior orders instead of on the evidence presented in this case. This was improper.
"In State v. Alabama Public Service Commission, supra, this court clearly held the doctrines of stare decisis and res judicata do not apply to decisions of administrative agencies such as the Commission, although consistency is essential if arbitrariness is to be avoided. The Commission erred by attempting to apply precedent as the determining factor in its acceptance of the figures proposed by APCO for its operating income and rate base. The Commission should have examined the abundant evidence presented regarding these items and based its findings solely on that evidence. It is possible the Commission did this; however, we cannot determine whether it did, or did not, base its findings in that regard on that evidence. However, it is quite clear that the Commission totally ignored the evidence pertaining to return on common equity. We do not hold that the adjustments to rate base and operating income proposed by the Attorney General should be made; however, we are stating that the evidence presented by the Attorney General and other intervenors, as well as the evidence presented by APCO, should be examined, weighed, and considered."
This quoted portion of the opinion which states that the APSC "totally disregarded the evidence" is incorrect. The order of the APSC, attached as an appendix to the opinion, affirmatively shows that the APSC considered "all evidence, circumstances and *1029 issues" submitted by the parties. Pertinent portions of the order read:
"The Commission over the past years by order has established criteria for what it believes to be a proper and lawful rate base in accordance with statutory law and Alabama Supreme Court decisions.
* * * * * *
"There was cross-examination of Company witnesses on rate base. A witness for the Attorney General and a witness for the Rate Hearing Administration Commission staff proposed several adjustments to rate base with the overall effect of reducing the rate base. We find that the rate base as presented by the Company conforms to the standards set out by the Commission in prior decisions and is proper and lawful in all respects. Therefore, we approve the rate base as set out hereinabove.
"The Commission has, over the years, as in rate base design, established precedent for the proper and lawful method of calculating operating income.
* * * * * *
"Numerous adjustments to operating income were proposed by parties of record. We find these adjustments not to be well founded and are inconsistent with the past action of this Commission. There is no compelling evidence of record which would justify our departing from precedent in regards to treatment of operating income except the following adjustment of the Commission. [The executive salary adjustment.]
* * * * * *
"Taking into consideration the adjustments mentioned above, the test period operating income applicable to the retail portion of the Company's operation is $192,881,227 computed as follows:

$145,028,102 Adjusted retail electric operating
 income
 47,853,125 AFUDC (including tax effect on
 debt portion)
____________
$192,881,227 Total test year operating income.

"* * * Upon careful consideration of all evidence, circumstances and issues, we feel that the proper allowed rate of return on common equity devoted to retail electric service should be 11.70%, as set out below:

 RETURN
COMPONENT AMOUNT COST RATE REQUIREMENT
Debt $1,862,474,534 × 8.55% = $159,241,573
Preferred Stock 355,319,390 × 8.12% = 28,851,934
Deferred Taxes 248,518,709 × 0.00% = 0
JDIC 31,561,077 × 8.70% = 2,745,814
Common Equity 880,435,781 × 11.70% = 103,010,986
 ______________ ______ ____________
Total $3,378,309,491 8.70% $293,850,307"
 ============== ====== ============

Since I am convinced from a reading of the order that the APSC considered all evidence, including the Attorney General's proposals, I see no need to have the APSC tell us again that it did, in fact, consider all the evidence; however, since a majority of this Court finds that it cannot determine whether the APSC had, in fact, considered all the evidence, it has followed the procedure under Code 1975, § 37-1-143, by remanding the appeal by the Attorney General to the APSC before entering a judgment in that appeal. Section 37-1-143 provides:
"The court shall review the case upon the certified record or transcript of the commission, and no new or additional evidence shall be introduced or oral testimony heard, but the court may, in advance of its judgment, remand the case to the commission for the purpose of taking additional testimony or other proceedings. In the event the court, in advance of its judgment, does not remand the case to the commission for the purpose of taking additional testimony or other proceedings, then the court shall have up to 180 *1030 days from the date the case is submitted to the court to render its judgment."
Having agreed that the Court followed the correct procedure if it cannot determine what the APSC did or did not consider in the Attorney General's appeal, I hasten to add that I cannot vote to remand the appeal by the Attorney General, prior to judgment. The record and the order of the Alabama Public Service Commission are too plain.
If not plain, from the record, I thought the question was settled at argument. During oral argument Mr. Justice Almon asked Hon. Wendell Cauley, who represented the Attorney General during oral argument, the following question:
"Q. Let me ask you one question on that. How do you know the Commission didn't hear all the evidence and just decide against you on that which is within their legislative prerogative?
"A. It's evident in several respects. We can't know of a certainty. We can only look to the order and go by what the Commission stated. An examination of the order on pages 3 and 4 shows that the only real finding by the Commission respecting rate base and operating income was that the company's proposals conformed to precedent and that the adjustments proposed by the intervenors were inconsistent with prior Commission action. The Attorney General maintains that those findings are arbitrary. I think that the question you asked is essentially: What evidence do we have that the Commission didn't hear our evidence and simply adopt theirs?
"Q. There is evidence to support what they did insofar as you are concerned?
"A. We've not denied that the company presented evidence to support their position and we presented evidence to support our position...." (Emphasis added.)
The record adequately supports the admission made by the Attorney General that there is substantial evidence to support the order of the Commission; therefore, I think the appeal by the Attorney General should be affirmed because the scope of review in the Attorney General's appeal is set out in the statute:
"All rates, fares, charges, classifications and joint rates and orders establishing rules, regulations, practices or services fixed by the commission shall be in force and shall be deemed prima facie reasonable and valid in any court wherein the reasonableness or validity thereof is properly drawn in question, and the burden shall be upon the party attacking said rates or orders to show that same are invalid or unfair and unreasonable." Code 1975, § 37-1-99.
Our review of the Attorney General's appeal is governed by these guidelines:
(1) The APSC order shall be taken as prima facie just and reasonable; (2) the judicial inquiry into the facts goes no further than to ascertain that there was substantial evidence to support the APSC's findings; and (3) the burden is upon one who would upset the order of the Commission to establish that the evidence does not sustain the conclusion reached by the Commission. Alabama Gas Corporation v. Wallace, 293 Ala. 594, 308 So.2d 674 (1975).
The Attorney General, as appellant, on his direct appeal, and as appellee in the direct appeal by Alabama Power, argued that adjustments in three different components of rate base should have been made: working capital, the accumulated provision for depreciation, and zero cost capital, the net effect of which would have reduced the company's rate base $70,112,741.
The Attorney General also argued that the APSC should have made adjustments to Operating Income: year-end adjustment, depreciation expense adjustment, donations adjustment, weather normalization adjustment, adjustment to deferred taxes due to change in the statutory tax rate, and AFUDC offset adjustment and income tax effect of debt portion of AFUDC adjustment.
*1031 Every adjustment proposed by the Attorney General to Rate Base or Operating Income, insofar as I can determine, had been previously considered by the APSC in other rate cases, except the Adjustment to Deferred Taxes Due to Change in the Statutory Tax Base. The APSC order, obviously, cannot be sustained on the theory that what the APSC did in other cases is appropriate in this case, "but radical departures from administrative interpretation consistently followed cannot be made except for most cogent reasons...." State v. Alabama Public Service Commission, 293 Ala. 553, 307 So.2d 521 (1975).
Expert witnesses testified for and against the proposed adjustments. The record is voluminous. The testimony is technical, and at times, complex, but the rule of law is simple. As writer of the opinion in General Telephone Co. of the Southeast v. Alabama Public Service Commission, 335 So.2d 151 (Ala.1976), I opined:
"The determination of a fair return to provide the public with adequate service is a question of fact within the legislative realm of rate-making. The rate of return in any given case calls for expert judgment not bound by any hard and fast rule or set formula. That judgment has been entrusted by the legislature to the Commission. This Court's inquiry ordinarily goes no further than to ascertain whether there is evidence to support the findings of the Commission. Alabama Gas Corp. v. George C. Wallace, as Governor, 293 Ala. 594, 602, 308 So.2d 674 (1975).
"In the case at bar, however, we have a rate case where the constitutional issue of confiscation is raised. Therefore, we must recognize the distinction between the limited scope of review when the action of the Commission is within the sphere of legislative authority and the broad scope of review which must be afforded when the question is whether the Commission has acted beyond the boundaries of legislative authorities. It is clear from our cases that a duty rests on this Court to examine the order of the Alabama Public Service Commission on the issue of confiscation and the schedule of intrastate rates and in this connection to exercise our independent judgment on both the facts and the law involved. Alabama Public Service Commission v. Southern Bell Tel. & Tel. Co., 253 Ala. 1, 42 So.2d 655 (1949). Of course, the ultimate question in every rate case is a fair rate of return from a predetermined rate base. What will constitute a fair return in a given case is not capable of exact mathematical demonstration. It is a matter more or less of approximation, about which conclusions may differ. State v. Alabama Public Service Commission, 293 Ala. 553, 307 So.2d 521 (1975). The conclusions of the parties in this appeal differ widely."
Chief Justice Torbert and Associate Justice Shores join in the views expressed hereinabove in this special concurrence and dissent. The views expressed in the following section are those of the writer of this dissent.

II
Rate-making necessarily involves approximation and is prospective, but this case presents another example of what this Court has faced during the past decade in trying to resolve conflicting theories on how the ultimate issue of a fair rate of return should be determined. On one occasion when opposing counsel came to exact opposite conclusions about what income would be produced, this Court, with several dissenting, remanded the case to the APSC to determine exactly what had happened. General Telephone Company of the Southeast v. Alabama Public Service Commission, supra.
After remand of that case, the APSC was forced to grant a rate increase, because actual experience was at odds with its reckoning. I suggest that the APSC might consider the actual experience of the Company under the present order, now that this docket is remanded to it. In that way, the APSC could determine whether the projected operating income figures are substantially correct. In short, if the 8.70% rate of return on the rate base produced, in fact, a *1032 rate of return to equity within the range shown to be supported by competent evidence, then the order of the Commission is not confiscatory. Otherwise, if the order produced only the amount of income projected, it is confiscatory, because the return to equity is too low. By examining past experience under orders, the APSC should be able to determine also whether proposed adjustments urged by intervenors such as the Attorney General are, in fact, valid.
Here, we have four appeals-two parties claiming confiscation, one claiming the rates were not fairly apportioned among customers, and the Attorney General claiming that the Company will make millions of dollars more than estimated. Now, logic says that these conclusions, which are based upon the same record cannot possibly co-exist-truth has to exist somewhere. What is it? My own examination of the record has convinced me that the Attorney General's projection of what the Company's income would be was substantially overstated.
I do not know what the actual experience of Alabama Power has been under the order entered in this case, but during those arguments before this Court on August 12, 1980, on the Company's request to supersede the order of the Alabama Public Service Commission in Docket No. 17859, Mr. Cauley agreed that the following was an accurate accounting of the Company's experience during the period indicated:

 ALABAMA POWER COMPANY
 Tabulation of return on average book common
 equity by month beginning 1978.
 1978 1979 1980
MONTH
Jan. 12.39% 4.41% 6.38%
Feb. 11.63 4.35 6.63
Mar. 10.43 4.28 7.07
Apr. 9.76 4.47 7.37
May 8.92 4.27 7.63**
June 8.04 4.14
July 7.23 3.74*
Aug. 6.35 4.01
Sept. 5.46 4.04
Oct. 5.28 3.94
Nov. 4.13 4.87
Dec. 4.46 5.82
* Rate increase granted the company by APSC in
Docket No. 17667. Case pending on appeal before
this court, Docket No. 78-880.
** Last actual data available before the record was
closed.

It is apparent from this chart that the Company did not earn a rate of return to equity which the Alabama Public Service Commission had determined was a fair rate of return on the reasonable value of the Company's property devoted to the public service.
The whole substance of the Attorney General's argument on this appeal was that the Company would realize more net operating income than the Alabama Public Service Commission estimated would be received. The Attorney General argued:
"The net effect of Dr. Wilson's proposed adjustments was to increase test period operating income $53,013,875. The dramatic effect of the Commission's acceptance of the Company's proposal and dismissal of the intervenors' adjustments out of hand may be seen by comparing the revenue deficiency determined by the Commission to the one it would have found by adopting Dr. Wilson's proposed operating income adjustments and leaving all other factors unchanged (e. g. rate base, rate of return). The Company's proposed test period net operating income of $192,881,227 would be increased to $245,895,102. Subtracting this test period net operating income ($245,895,102) from the return requirement of $293,850,307 yields a return deficiency of $47,955,205, which translates to a revenue deficiency of $98,954,361. The difference in the revenue deficiency is $110 million, ignoring the intervenors' proposed rate base adjustments."
During arguments on the request for supersedes in Docket No. 17859, the Attorney General admitted that the Company did not realize the type of income his expert testified *1033 would be available under the rate order we are reviewing on this appeal.
I realize that these admissions by the Attorney General are not in the current record, but when the Attorney General admits that the whole basis for his request for reversal is not borne out by experience, I have no hesitancy, when confiscation is claimed, to order a procedure which would assist in determining what the realities are.
The United States Supreme Court has said:
"Elaborate calculations which are at war with realities are of no avail."
Lindheimer v. Illinois Bell Tel. Co., 292 U.S. 151, 164, 54 S.Ct. 658, 663, 78 L.Ed. 1182, 1191 (1934).
In New York Telephone Company v. New York Public Service Commission, 29 N.Y.2d 164, 324 N.Y.S.2d 53, 272 N.E.2d 554, 556 (1971), the Court said
"The majority of the Commission does not deny confiscation, but was of the opinion that the Company could by way of a new rate proceeding secure whatever relief it believes it can justify under the changed conditions. The dissenting Commissioners pointed out that the evidence was clear that there was a present confiscation of the Company property and it was no answer to invite the Company to file new rates which would again be subject to suspension, during which period the Company would be accorded the privilege of continuing its operations under the alleged confiscatory rates.
* * * * * *
"The law is well-settled that the Commission may not rely on a reckoning when actual experience is available and establishes that the predictions have been substantially incorrect. (West Ohio Gas Co. v. Public Utilities Comm., 294 U.S. 79, 82, 55 S.Ct. 324, 79 L.Ed. 773.) In Lindheimer v. Illinois Bell Tel. Co., 292 U.S. 151, 164, 54 S.Ct. 658, 663, 78 L.Ed. 1182 the court said, `Elaborate calculations which are at war with realities are of no avail'. This principle applies not only in cases where the rate proceeding fixes the rate but especially where the Commission directs refunds. (West Ohio Gas Co. v. Public Utilities Comm., supra.) There the court said: `To prefer the forecast to the survey is an arbitrary judgment.' In a recent case, Boston Gas Co. v. Department of Public Utilities, 359 Mass. 292, 269 N.E.2d 248, pp. 257-259 (1971) the court held that the Commission must consider evidence of attrition which has actually occurred since the test period. The Massachusetts case rationale is not new. Commissions are bound to take into account drastic changes in economic circumstances. (See Atchison, T. & S. F. Ry. Co. v. United States, 284 U.S. 248, 52 S.Ct. 146, 76 L.Ed. 273.) This court made this clear in People ex rel. Consolidated Water Co. of Utica v. Maltbie, 275 N.Y. 357, 367-368, 9 N.E.2d 961, 964, app. dsmd. 303 U.S. 158, 58 S.Ct. 506, 82 L.Ed. 724 in this statement: `If the opinion or prophecy of the expert witnesses given in May, 1932, was proven wrong by events occurring during the interval, the commission could, of course, not base any finding upon the discredited opinion. If the commission was bound to take judicial notice of such events, its decision must be based upon them rather than upon the discredited prophecy. If proof of such events was necessary, it might be offered by the party who challenged the opinion. In any case the party who attacks the correctness of the decision must show that intervening events have destroyed the force of opinion testimony upon which the decision is based.'
"Where there is a great disparity between the predicted rate of return found necessary by the Commission and the return actually earned, a suitable adjustment should be made to reflect the attrition trend or the erosion that has taken place. In Matter of Bronx Gas & Elec. Co. v. Maltbie, 271 N.Y. 364, 375, 3 N.E.3d 512, 516, the court said: `"Experience" how much better this is than expert testimony, whether dealing in history or prophecy.'
"Turning to the suggestion made by the Commission that the Company is restricted to the initiation of a new rate *1034 proceeding, it is only necessary to point to the comment made by Justice Cardozo in West Ohio Gas Co. v. Public Utilities Comm.: `Present confiscation is not atoned for by merely holding out the hope of a better life to come.'" (Emphasis added.)
The Company has already filed a new rate request, and an appeal is now pending in that later case. We have conducted a hearing on the Company's request to supersede the order of the APSC in that case (Docket No. 17859). During that hearing, I asked the Hon. Wendell Cauley if his projections of the amount of income the Company would make were accurate when considered in light of the Company's actual experience. He admitted that his projections were not consistent with the actual experience of the Company.
Having said all of the above, let me quickly add that the question of "honest, efficient and economical management" [§ 37-1-80], is always a consideration in a rate hearing, but there is no finding in this docket that the Company was not honestly managed, except the finding by the APSC that the Company paid its executives too much in salaries.
In any event, I do not have to consider the Attorney General's admissions during the hearing on the Company's Application for Supersedes in Docket No. 17859. As I have already pointed out, I think the Alabama Public Service Commission considered the Attorney General's proposals and rejected them. My review of the record convinces me that the Attorney General has failed to show why he is entitled to have this case sent back to the Alabama Public Service Commission. I must respectfully dissent from that portion of the order which remands the Attorney General's appeal to the Commission.
I also dissent as to that part of the opinion which would not permit the Commission to treat charitable contributions as an item of expense. See Justice Jones's dissent in Alabama Power Company v. Alabama Public Service Commission, 359 So.2d 776 (Ala. 1978).
TORBERT, Chief Justice (concurring specially, in part; dissenting in part).
I concur in Part I of the special concurrence and partial dissent of Justice Maddox. I concur in that part of the majority opinion respecting the treatment of charitable contributions for reasons set down in Part II of the case of Alabama Power Co. v. Alabama Public Service Commission, 359 So.2d 776 (Ala.1978).
SHORES, J., concurs.
JONES, Justice (concurring in part and dissenting in part):
I concur specially in the majority opinion in order to call attention to what I believe is a narrow point of difference between the majority opinion and the specially concurring opinion of Mr. Justice Maddox. I was initially inclined toward the views expressed by Mr. Justice Maddox because I, too, believe the record is reasonably clear that the Alabama Public Service Commission did take into consideration the evidence presented by the Attorney General and other intervenors. Further, I believe that the "precedent" mentioned by the Alabama Public Service Commission refers to prior methodology and not to a blind acceptance of previously established figures proposed by Alabama Power Company.
Nevertheless, I have chosen to cast my vote with the majority because I believe if these assumptions are correct (as ably articulated by Mr. Justice Maddox), then, no point of difference, in fact, remains between the views expressed by the majority and those of Mr. Justice Maddox. After all, the opinion, in partial summary of its holding under Part II, states:
"The Commission should have examined the abundant evidence presented regarding these items and based its findings solely on that evidence. It is possible the Commission did this; however, we cannot determine whether it did, or did not, base its findings in that regard on that evidence."
I dissent as to that part of the opinion which requires the Commission to follow *1035 this Court's mandate in Alabama Power Co. v. Alabama Public Service Commission, 359 So.2d 776 (Ala.1978), with respect to the Commission's treatment of charitable contributions. See my dissenting opinion in that case.
 APPENDIX A
 STATE OF ALABAMA
 ALABAMA PUBLIC SERVICE COMMISSION
 P. O. BOX 991
 MONTGOMERY. ALABAMA 36130
JUANITA W. McDANIEL. PRESIDENT RALPH S. McLEMORE. JR.
PETE MATHEWS, ASSOCIATE COMMISSIONER EXECUTIVE DIRECTOR
JIM FOLSOM. JR. ASSOCIATE COMMISSIONER
 WALLACE TIDMORE
 SECRETARY
ALABAMA POWER COMPANY, PETITION: For approval of new
 schedules of rates for retail
 Petitioner electric service.
 DOCKET NO. 17667

FINDINGS AND ORDER OF THE COMMISSION
BY THE COMMISSION:
This proceeding was instituted by the filing of new schedules of retail electric rates by Alabama Power Company (the Company) on December 20, 1978, with an effective date of January 19, 1979, with a request that the effective date be accelerated to December 29, 1978. The Commission, on January 9, 1979, suspended the operation of the proposed rates through July 19, 1979, the maximum time allowed under law. In its filing letter with this Commission, the Company requested an emergency rate increase. This request for an emergency rate increase was renewed by its filing of January 8, 1979. On January 26, 1979, the Commission issued a Notice of Public Hearing in this docket related to the Company's request that the filed rate schedules be allowed to go into effect on an emergency basis during the period of suspension. The Commission's notice recognized that the Company had filed direct testimony and exhibits in support of its request for an emergency rate increase. The notice set hearings on the emergency aspects of this case on February 14, 1979. Hearings on the request for an emergency rate increase commenced on February 14, and continued through February 16, 1979. The proceeding was recessed and resumed on February 20 and continued through February 22, 1979, at which time the hearing on the Company's emergency rate increase application was concluded. By order issued March 6, 1979, the Commission granted a partial emergency rate increase to the Company by increasing each individual component of the filed rate schedules by 9½%.
During the proceeding, including the emergency hearings thereof, the Commission received numerous petitions to intervene. Written petitions to intervene were received from: The Attorney General of the State of Alabama, pursuant to the provisions of Section 37-1-16 of the Code of Alabama 1975 (the Code); Elizabeth Jordan, Bessie Prince, R. C. Gary and Lillian Bilbro, represented by Legal Services Corporation of Alabama, Inc.; the Alabama Black Caucus on Aging; the Alabama League of Aging Citizens, Inc.; John Paul Ripp; General Service Administration; Candice J. Muehlbauer; Alabama Utilities Consumer Association, Inc.; Retired Iron and Steel Workers Union; R. S. Crowder; Airco, Inc., Alabama Metallurgical Corp., Ciba-Geigy Corporation, Courtaulds North America, Inc., Diamond Shamrock Corporation, Ideal Basic Industries, Inc., Kimberly-Clark Corporation, Monsanto Company, Ohio Ferro-Alloys, Olin Corporation, Stauffer *1036 Chemical Company, Uniroyal, Inc., and Union Carbide Corporation (collectively the Industrial Group). The above petitions for intervention were allowed for the purpose of this phase of the proceeding and all petitioners for intervention were allowed to participate in the proceedings which lead to this order.
The proceedings related to the Company's request for a permanent rate increase were long and arduous. Hearings on the permanent rate increase request commenced on April 16, 1979. Cross-examination of the Company's witnesses was conducted during the periods April 16-20 and April 24-26. Cross-examination of the intervenors' direct testimony was conducted during the periods May 21-25, June 11-15 and June 18-20. The Company's rebuttal testimony was cross-examined on June 21-22 and June 25-26. During the course of this protracted proceeding, an extensive record has been developed with over 120 exhibits, many with multiple pages. The transcript consists of several thousand pages. Twenty-one different witnesses appeared before the Commission and were cross-examined. Many of these witnesses were experts in financial, economic, accounting and rate making fields. The Commission also heard numerous statements from the public during the course of the hearings.
After several sessions of the hearings on the permanent rate increase request, the Commission issued its order of May 21, 1979, following a motion by the Industrial Group argued by the parties on the record. This order provided that this docket would be held open after action on the Company's rate filing in order to give the appropriate public notice and the proper consideration needed for determinations under the Public Utility Regulatory Policies Act of 1978, 16 U.S.C. 2601, et seq., ("PURPA"). The public notice respecting consideration of the rate design standards under Section 111 of PURPA was issued on June 27, 1979, along with notice of a rulemaking proceeding (APSC Docket No. 17752) concerning other PURPA standards.

THE TEST PERIOD
The Company presented its direct case in support of its requested rate increase based upon financial data and rate information for the 12-month period ended November 30, 1978. The intervenors' presentation was based on the same 12-month period. There is no disagreement among the parties about the adoption of this 12-month period as the test period and we find the appropriate test period to be the 12-month period ended November 30, 1978. This finding is in accordance with the statute, § 37-1-80, Code of Alabama 1975, which requires the test period to be based on financial data "as of the most recent date available."

RATE BASE
The Commission over the past years by order has established criteria for what it believes to be a proper and lawful rate base in accordance with statutory law and Alabama Supreme Court decisions.
The rate base as presented by the Company was as follows:

Electric plant in service $3,501,833,250
Accumulated provision for depreciation (714,684,860)
 _____________
Electric plant in service, depreciated 2,787,148,390
Construction work in progress
 Electric 725,084,970
Electric plant acquisition adjustments 114,370
Electric plant held for future
 use 6,270,172
Nuclear fuelNet 63,962,131
Unamortized leasehold improvements 1,510,310
Working capital 176,711,273
Less:
 Customer advances for construction (1,914,634)
 ______________
Statutory rate baseElectric $3,758,886,982
 ==============
Statutory Rate Base Applicable
 to Retail Electric Service $3,500,095,093
 ==============

*1037 There was cross-examination of Company witnesses on rate base. A witness for the Attorney General and a witness for the Rate Hearing Administration Commission staff proposed several adjustments to rate base with the overall effect of reducing the rate base. We find that the rate base as presented by the Company conforms to the standards set out by the Commission in prior decisions and is proper and lawful in all respects. Therefore, we approve the rate base as set out hereinabove.

OPERATING INCOME
The Commission has, over the years, as in rate base design, established precedent for the proper and lawful method of calculating operating income.
The adjusted operating income applicable to the Company's retail electric service for the twelve months ended November 30, 1978, as presented by the Company, is as follows:

Operating revenues $945,680,698
Operating expenses:
 Operation and maintenance expenses 590,287,857
 Depreciation expense 116,058,191
 Amortization of plant acquisition
 adjustments 16,082
 Amortization of property losses 7,100,887
 Amortization of investment tax
 creditCredit (1,630,912)
 Taxes other than income taxes 63,320,432
 Income taxesFederal (27,140,555)
 State (3,060,884)
 Provision for deferred income
 taxes 54,983,989
 Provision for deferred income
 taxesCredit (19,087,858)
 Provision for investment tax
 credits 6,185,000
 ___________
 Total electric utility operating 787,032,229
 -----------
 expenses
Net electric utility operating income $158,648,469
 ============
Portion of Above Applicable to
Retail Service
Operating revenues $861,759,666
Operating expenses 761,877,625
 ____________
Operating income $144,882,041
 ============

For testing return on rate base there is added to the computations above the allowance for funds used during construction account separated to retail in the amount of $47,853,125.
The total return which will be available to the Company to meet its capital requirements consists of both operating income and the "below the line" item of allowance for funds used during construction (AFUDC). The total amount of AFUDC included in the retail return is $47,853,125.
Numerous adjustments to operating income were proposed by parties of record. We find these adjustments not to be well founded and are inconsistent with the past action of this Commission. There is no compelling evidence of record which would justify our departing from precedent in regards to treatment of operating income except the following adjustment of the Commission.
The evidence of record indicates clearly the distressed financial condition of the Company. The Company has laid off employees and taken numerous measures to cut back on expenditures. The construction program has come to a complete standstill. One measure the Company did not and has not taken is a reduction in the executives salaries. In fact, the executives received an increase in salaries during the test period which to us indicates poor judgment. We feel that the action taken by the Company was not proper and we are hereby deducting from retail electric operating expenses the amount of all executives salaries above $50,000 per person. This total amount is $288,574. The net effect on the retail electric operating income is to increase the operating income of $144,882,041 by $146,061 resulting in adjusted retail electric operating income of $145,028,102.
Taking into consideration the adjustments mentioned above, the test period operating income applicable to the retail portion of the Company's operation is $192,881,227 computed as follows:

*1038
$145,028,102 Adjusted retail electric operating
 income
 47,853,125 AFUDC (including tax effect on
 debt portion)
____________
$192,881,227 Total test year operating income.

RATE OF RETURN
Several witnesses testified in this proceeding on recommended rate of return. Company witnesses testified to a range of 15% to 15.50% return to common equity. One intervenor witness recommended a range of 8.00% to 14.00%. The other intervenor witnesses recommended range of 13.30% to 13.65%. The Commission's witness recommended a range of 13.00% to 13.25%.
We are aware that the Company's earnings over the past several months have steadily deteriorated and that rate relief is necessary in order to restore the Company to a viable operating electric utility. All parties of record seem to agree to this statement. We are also aware of the rapid escalation in the price of all consumer goods and services and the additional burden on the ratepayers of Alabama that an increase in the magnitude sought by the Company would cause. We are also mindful of the Presidential wage-price guidelines and we are attempting to act within the spirit of those guidelines. Upon careful consideration of all evidence, circumstances and issues, we feel that the proper allowed rate of return on common equity devoted to retail electric service should be 11.70%, as set out below:

 RETURN
COMPONENT AMOUNT COST RATE REQUIREMENT
Debt $1,862,474,534 × 8.55% = $159,241,573
Preferred Stock 355,319,390 × 8.12% = 28,851,934
Deferred Taxes 248,518,709 × 0.00% = 0
JDIC 31,561,077 × 8.70% = 2,745,814
Common Equity 880,435,781 × 11.70% = 103,010,986
 ______________ ______ ____________
Total $3,378,309,491 8.70% $293,850,307
 ============== ====== ============

Dividing the return requirement of $293,850,307 by the rate base of $3,500,095,093 gives the rate of return on rate base of 8.40%, which we find to be just and reasonable. Subtracting from this return requirement the Company's adjusted test period operating income of $192,881,227, as previously developed, we find a return deficiency of $100,969,080, which translates to a revenue deficiency of $208,347,398.

THE WAGE-PRICE GUIDELINES
We have determined above that the rate deficiency for Alabama Power Company based upon the test year is $208,347,398. In granting the relief which is so clearly called for by such a revenue deficiency, we are aware, as indicated in our emergency order of March 6, 1979, of the guidelines promulgated by the President's Council on Wage and Price Stability and of the voluntary limitations sought for virtually all pricing in the nation. It is our intention to conform to the essential objectives of that program. We must, however, note that the Council has established exceptions to the application of these guidelines which are clearly appropriate in the case before us.
The guidelines provide for exceptions in situations where their application would cause undue hardship or gross inequity (Guidelines, Section 705A-6(b)). "Undue hardship" is defined as "a situation that seriously threatens the financial viability of a company" (Guidelines, Section 706.33).
An additional standard issued by the Council on March 19, 1979, provides in its Section 705C-8(d) as follows:
"... Commissions [state regulatory commissions] may find it necessary to grant exceptions in order to enable utilities to raise capital in order to finance construction that is needed to serve customers or to meet Federal policies that seek to reduce dependence on oil. Circumstances *1039 under which the standard could impose a hardship for those utilities committed to such investments include:
"(i) pro-forma interest coverage ratios are inadequate to assure the legal minimum of bond indenture.
"(ii) the Market to Book ratio of outstanding common stock is below minimum levels judged by the Commission to be acceptable, a level which in our judgment would not exceed 0.9 under present circumstances for purposes of granting a hardship exemption but not for other purposes.
"(iii) cash flows are judged by the Commission to be inadequate."
Unchallenged proof in this record shows Alabama Power Company to be in the category for which these exemptions to the guidelines are intended. It has been demonstrated that the tests of financial viability, interest coverage ratios, market-to-book ratio of common stock and adequate cash flows will not be met under the emergency rate order and that the construction of facilities which could substantially reduce dependence on oil will remain stalled until the Company's financial distress can be relieved.
We hold that the Company is excepted from the guidelines upon the considerations noted. Nevertheless, it is our intention to comply with the spirit of the guidelines and with the Council's specific suggestion that commissions granting increases:
"adopt phasing schedules that limit the initial rate increases, exclusive of increases due to higher fuel costs to the greatest extent feasible, when such action is permitted by law, is in the long-run interest of consumers, and would be reasonable."
We are "phasing" the increase in rates for Alabama Power Company under the order here entered.
The emergency increase allowed under our order of March 6, 1979, will be made permanent and the Company will be ordered to file revised schedules to accomplish the phasing of the increases necessary to relieve the revenue deficiency which we have determined. Those phasing schedules will provide for an additional 5% increase on July 19, 1979 and another increase of 8% for the balance of the deficiency, to be made effective for service rendered on and after January 1, 1980.
On the one hand, these "phasing schedules" will soften the impact of the rate increase upon the consumer and postpone a substantial portion of the increase until after the summer high use period.
On the other hand, our approval of all steps of the schedules will give assurance of the further increases in revenue so that the Company may utilize that assurance to regain a measure of financial integrity and reopen the credit lines which have been closed to it. We shall thus expect it promptly to revive the construction program, to respond to delayed service applications, to promptly restore disconnected service, and to restore other essential operations which have been curtailed during the progress of these proceedings.

ORDER OF THE COMMISSION SETTING PERMANENT RATES
IT IS, THEREFORE, ORDERED BY THE COMMISSION, That the following rate schedules, as filed by the Company on December 20, 1978, are hereby denied: Schedules FD, LPS, LPM, LPL, LPEM, LPEL, LFS, LAF, HLF, OFP, PG, XI, XOM, XTP, XWP and PLPL and the filed revisions of interruptible credits;
IT IS FURTHER ORDERED, That the Company file revisions of said Schedules FD, LPS, LPM, LPL, LPEM, LPEL, LFS, LAF, HLF, OFP, PG, XI, XOM, XTP, XWP and PLPL, incorporating uniform increases in each individual component of such rates so as to remedy the revenue deficiency found above;
IT IS FURTHER ORDERED, That such revised schedules shall provide for the required increases to be accomplished in three phases, the first step being the 9½% increase on annual test period revenues, in effect under the "Order of the Commission on Emergency or Interim Rates" dated March 6, 1979, with the amount of such *1040 increase being hereby made permanent; the second step being a 5% increase on the annualized revenues including the first step, with such increase to be effective for service rendered on and after July 19, 1979; and the third step to provide the balance of the revenue deficiency, being an 8% increase on the annualized revenues including the other two steps. The final step shall be effective for service rendered on and after January 1, 1980.
IT IS FURTHER ORDERED, That, it being recognized that service rendered on and after specified dates cannot be determined by simultaneous meter readings, the Company shall compute bills on the basis that the metered usage has occurred evenly and ratably over the first affected billing period of each step;
IT IS FURTHER ORDERED, That, the Commission having hereby issued its order with respect to the proposed increased rates filed by the Company, this docket will now remain open pursuant to the Commission's order of May 21, 1979 herein and, upon the public notice issued by the Commission on June 27, 1979 and hearings to be set in connection therewith, the Commission will proceed to consider the rate design standards under Section 111 of the Federal Public Utility Regulatory Policies Act of 1978 (PURPA); changes or alterations in any of the revised rate schedules which may result from further orders in this PURPA aspect of the proceeding shall not increase or decrease the total revenue to which the Company is entitled under this order.
DONE at Montgomery, Alabama, this 19th day of July, 1979.
 ALABAMA PUBLIC SERVICE
 COMMISSION
 (s) Juanita W. McDaniel
 Juanita W. McDaniel, President
 (s) Pete Mathews
 Pete Mathews, Commissioner
Commissioner Jim Folsom, Jr., dissents and his dissenting opinion follows.

DISSENTING OPINION OF COMMISSIONER JIM FOLSOM, JR.
In my opinion the facts of the case do not justify the additional 5% proposed in the majority order.
Intervenors in the case presented briefs establishing recommendations of a range between 10½% to 21%-no other figures were given.
I am of the opinion that the present 9½% should stay in effect and an 8% cost of living increase be permitted on January 1, 1980.
NOTES
[1] The phrase "statutory rate base applicable to retail electric service" means that the rate base, calculated pursuant to § 37-1-80, Code 1975, has been separated to eliminate non-electric utility property and that portion of the company's properties which are devoted to wholesale electric service and regulated by the Federal Energy Regulatory Commission.
[2] This was the figure proposed by APCO, which the Commission adopted with virtually no change.